**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 3:13-CR-123 |
| JESSIE CON-UI, | (JUDGE CAPUTO) |
| Defendant. | |

**MEMORANDUM**

Presently before me is Defendant Jessie Con-Ui's ("Mr. Con-Ui") Motion to Compel Compliance With This Court's Order of May 8 and Request for Additional Discovery. (Doc. 872) The parties have briefed the matter, and, following a discovery conference on July 20, 2016, several of Mr. Con-Ui's requests have been resolved. Additionally, the parties have agreed to further attempt to resolve two of the outstanding requests.  Nevertheless, several of Mr. Con-Ui's discovery requests remain outstanding, and the parties have been unable to resolve the disputes over the discovery of this information.  Specifically, the Government objects to certain requests made by Mr. Con-Ui or to producing certain categories of discovery (or documents or evidence within these categories), namely:

1.[1]   A request for an Order directing that the prosecutors in this case certify compliance with the mandates and procedures of the "Ogden Memo" (Doc. 872, 3[2].), or, in the alternative, that the court confirm whether or not the government has complied with the Odgen Memo with respect to its discovery obligations. (Doc. 872, 3; Doc. 887, 17.)

2.   A supplemental request for specific categories of nationwide Bureau of Prisons ("BOP") data. (Doc. 872, 4-4; 872-1, 23-31.)

5.   Compliance with the May 8, 2015 Order that Mr. Con-Ui was to be provided all reports, memorandum, video and audiotapes, emails and any other information regarding post-incident communication between Mr. Con-Ui and Chaplin Ngozi Osuju from USP Canaan.  (Doc. 872, 8-9.)

---

[1] The numbers match those assigned by Mr. Con-Ui to the discovery categories in his memorandum of law in support of his motion for discovery. (Doc. 887)

[2] Unless otherwise indicated, the page number referenced is to the pagination assigned by the electronic case filing system without regard to the parties' assigned page numbers.

7. Job performance evaluations for corrections officers who worked at USP Canaan in Unit C where Mr. Con-Ui was housed from September 10, 2011 to February 25, 2013. (Doc. 872, 10.)

8. USP Pollock Inmate roster from November 21, 2010. (Doc. 872, 10-11.)

9. USP Victoryville Inmate roster from October 23, 2009. (Doc. 872, 12.)

13. All correspondence and communications between the United States Attorney's Office, OSHA and the Bureau of Prisons related to OSHA's investigation of USP Canaan. (Doc. 872, 17.)

14. All investigative, chain-of-custody and expert reports, forensic analysis, and notices of experts. pertaining to the allegation that Mr. Con-Ui possessed contraband on January 30, 2014; ADX "shakedown" logs detailing seizures of contraband for 2012, 2013 and 2014; all disciplinary allegations and findings for seized contraband at ADX for 2012, 2013 and 2014; and all BOP materials pertaining to seizure of "stringers", including training material, statistics, and photographs of seized "stingers" for 2012, 2013 and 2014. (Doc. 872, 18-19.)

15. The documents and data underlying the 2012 USP Canaan Institutional Character Profile and 2013 Canaan Social Climate reports. (Doc. 872, 20-21.)

**I.     Background**

On May 8, 2015, I issued an order granting certain requests and denying other requests for discovery made by Mr. Con-Ui. (Doc. 603) On January 20, 2016, the Government notified Mr. Con-Ui's counsel and the court that it had sent its final discovery production relevant to the May 8, 2015 Order. (Doc. 866) On February 29, 2016, Mr. Con-Ui filed the current motion seeking compliance with the May 8, 2015 Order and additionally seeking new discovery unrelated to the previous productions. (Doc. 872) On March 25, 2016, while Mr. Con-Ui's current request was pending, the Government filed an amended notice of intent to seek the death penalty. (Doc. 884) The amended notice evidenced the Government's decision not to attempt to prove the non-statutory aggravating factor of future dangerousness. (*Id.*)

**II.     Discussion**

Mr. Con-Ui and the Government have set forth their respective positions on the current requests. Importantly, Mr. Con-Ui argues that the requested discovery is critical to the presentation of his mitigation evidence and contends that the removal of the future

2

dangerousness factor from the notice does not remove "future danger as an issue in the case" but, rather "[i]t remains an issue that defense counsel must investigate, confront and attempt to rebut at trial." (Doc. 887, 3.) The Government, for its part, contends that Mr. Con-Ui's requests are "not relevant to a motion to compel or properly subject to disclosure under Rule 16", especially in light of the amendment of the notice of intent. (Doc. 889, 2-3.)

The parties disagree about whether the issue of future danger in a capital case is only present when the non-statutory aggravating factor is sought to be proved by the government, *i.e.* the Government's position (Doc. 889, 2-3.); or, whether future danger remains an issue in "any capital case where the Government presents, as evidence in aggravation, a significant history of violence", *i.e.* Mr. Con-Ui's position (Doc. 887, 4.).[3] It is

---

[3]

Both parties argue the issue extensively. Mr. Con-Ui argues that because the Government will attempt to prove Mr. Con-ui's other alleged acts of past violence, both while in and out of custody, future danger is at issue. (Doc. 887, 4.) Mr. Con-Ui cites to a line of Supreme Court cases in an effort to "identif[y] . . . the circumstances implicating the issue of future danger, even where future danger is neither explicitly alleged or argued." (Doc. 887, 6 n. 1 citing *Skipper v. South Carolina*, 476 U.S. 1, 90 L.Ed. 2d 1 (1986)(denial of due process to disallow evidence of defendant's good behavior in prison); *Simmons v. South Carolina*, 512 U.S. 154, 168-69, 129 L.Ed.2d. 133 (1994) (If state rests case for death penalty on premise that defendant will be dangerous in future, due process requires the opportunity for defendant to "deny or explain".); *Kelly v. South Carolina*, 534 U.S. 246, 151 L.Ed. 2d 670 (2002)(trial court should have provided a parole ineligibility instruction because the state "accentuated the clear implication of future dangerousness raised by the evidence."); *see also United States v. Troya*, 733 F.3d 1125, 1136 (11th Cir. 2013) (based on the government's case, district court erred in excluding expert testimony regarding future danger despite the government's removal of the future dangerousness from the notice of intent).

The Government argues that because future danger has been removed from the amended notice of intent, Mr. Con-Ui should "not be permitted to present general evidence of security or life within the Bureau of Prisons." (Doc. 889, 24 n. 3.) The Government contends that none of the cases relied on by Mr. Con-Ui "held that merely alleging uncharged acts of violence or serious criminal activity as non-statutory aggravating factors places future dangerousness at issue." (Doc. 889, 3-4.) The Government also cites to several cases: *Robinson v. Beard*, 762 F.3d 316, 327 (3d Cir. 2014), cert. denied sub nom. *Robinson v. Wetzel*, 136 S. Ct. 53, 193 L. Ed. 2d 57 (2015) (habeas relief requested; applying *Simmons*); *Kindler v. Horn*, 542 F.3d 70, 90 (3d Cir. 2008), vacated and remanded sub nom. *Beard v. Kindler*, 558 U.S. 53, 130 S. Ct. 612, 175 L. Ed. 2d 417 (2009)(*Simmons*

unknown at this time what evidence will be presented at trial, and the cases cited by the parties regarding when future danger is an issue in a case, although instructive, do not speak to discovery disputes.[4]

As I have previously stated, the relevance and materiality of discovery information depends on the facts and circumstances of each case, and is governed by the standards applicable to requests for discovery under Rule 16 of the Federal Rules of Criminal Procedure and *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963),

---

did not apply because Defendant's "future dangerousness never became an issue"); *Bronshtein v. Horn*, 404 F.3d 700, 716 (3d Cir. 2005); *Bridges v. Beard*, 941 F. Supp. 2d 584, 635 (E.D. April 23, 2013) (reviewing state death sentence).

In the cases cited by both parties, the issue of whether future danger was alleged was being addressed after the case had proceeded through the penalty phase. Despite the parties' extensive argument, a definitive determination of whether future danger will be an issue in this case is premature at this stage.

[4]

The exception to this listing is *United States v. Edelin*, 180 F. Supp. 2d 73 (D. D.C. 2001). In *Edelin*, the court agreed with the government that any evidence of the BOP's ability to shield against any future dangerousness of the defendant was not mitigation evidence. *Id.* at 76. Further, because the government had assured the court that it would not argue the defendant's future dangerousness, there would be nothing to rebut. *Id.* at 76-77. The court also precluded the defendant from introducing general BOP evidence reasoning that because the impact on the jury caused by the introduction of the defendant's other acts of violence was speculative, to allow the defendant the opportunity to "rebut any *possible* conclusion that might be drawn from the evidence, [would cause] the penalty phase of any capital case [to] be an endless and discombobulated evidentiary morass."*Id.* at 78. (emphasis in original) Based on its ruling, the court denied the defendant's request for "base rate data about the violence incidence rates for different prison populations, statistical information about the frequency of violent incidents at the BOP facility at Florence, and other violence risk assessment information compiled by the Bureau of Prisons." *Id.* at 74. Notably, however, the court stated "that if the Government's evidence and argument rose to such a level that defendant Edelin's "future dangerousness" were an *inescapable* conclusion to be drawn by the jury, that would present the Court with a situation where defendant Edelin's right to rebut may be triggered." *Id.* at 78 (emphasis in original).

In the current case, the Government has stated it will not argue Mr. Con-Ui's future dangerousness, however, the evidence presented cannot be predicted with confidence at this stage of the proceedings, therefore, I will respectfully take a different position than the court in *Edelin.*

and its progeny. Because the discovery currently sought largely deals with mitigation evidence to be presented during any potential penalty phase for Mr. Con-Ui, and because the parties' differing positions[5] on propriety of Mr. Con-Ui's requests, I will briefly discuss mitigation evidence.

The Supreme Court has stated that the Eighth Amendment requires that the jury "'not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978) (plurality)). Restated, "the jury [must] be able to 'consider and give effect to [a defendant's mitigating] evidence in imposing sentence.'" *Penry v. Johnson*, 532 U.S. 782, 797, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001).

In order to receive discovery related to mitigation evidence, the requesting party "need only establish a 'substantial basis for claiming' that a mitigating factor will apply at the penalty phase, in order to invoke the Government's obligation under *Brady* and its progeny to produce any evidence which is material to that mitigating factor." *United States v. Beckford*, 962 F. Supp. 804, 811 (E.D. Va. 1997) (citing *United States v. Agurs,* 427 U.S. 97, 106, 96 S.Ct. 2392, 2398–99, 49 L.Ed.2d 342 (1976)).[6] To be granted discovery under

---

[5] The Government requests that I deny Mr. Con-Ui's unresolved requests because Mr. Con-Ui "embraces an overly broad view of the scope of potential mitigating evidence, which could conceivably allow testimony unrelated to his own background, character or the circumstances of the offense, in order to justify additional discovery." (Doc. 889, 23.) Mr. Con-Ui counters by arguing that Supreme Court precedent allows for an "'almost limitless . . .'" amount of mitigation evidence. (Doc. 893, 13.)

[6] The statutory mitigating and aggravating factors to be considered during the penalty phase of a capital case are codified at 18 U.S.C. § 3592. Additionally, "[a]t the sentencing hearing, information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592." 18 U.S.C. § 3593.

Rule 16(a)(1)(E)[7], the defendant must make a *prima facie* showing of materiality. *United States v. RMI Co.*, 599 F.2d 1183, 1188 (3d. Cir. 1979). "Materiality means more than that the evidence in question bears some abstract logical relationship to the issues in the case. . . . There must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor." *Id*. (quoting *United States v. Ross*, 511 F.2d 757, 762-63 (5th Cir. 1975) and citing *United States v. Brown*, 562 F.2d 1144, 1152 n.8 (9th Cir. 1977); *United States v. Johnson*, 577 F.2d 1304, 1309 (5th Cir. 1978); *United States v. Orzechowski*, 547 F.2d 978, 984-85 (7th Cir. 1976) cert. denied, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977).).

The presentation of mitigation evidence is not, however, without limits. The Federal Death Penalty Act's evidentiary standards "do not mean that the defense has carte blanche to introduce any and all evidence that it wishes." *United States v. Fell*, 531 F.3d 197, 219 (2d Cir. 2008). The Sixth Circuit has stated:

> Mitigation evidence,. . ., is not an empty concept to be filled by whatever a lawyer or court thinks might persuade a single juror in a particular case. It is true that the Supreme Court has said that mitigation evidence includes evidence that "the sentencer could reasonably find . . . warrants a sentence less than death." *Tennard v. Dretke*, 542 U.S. 274, 285, 124 S. Ct. 2562, 159 L. Ed. 2d 384 (2004) (quotation marks omitted). But the key word there is "reasonably"; and read in the context of the rest of the Supreme Court's mitigation-evidence caselaw, and *Penry* in particular, that passage simply refers to evidence relevant to "a reasoned moral response to the defendant's background, character, and crime." *Penry*, 492 U.S. at 319, 109 S. Ct. 2934.

---

[7]

> **(E) Documents and Objects.** Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
> **(i)** the item is material to preparing the defense;
> **(ii)** the government intends to use the item in its case-in-chief at trial; or
> **(iii)** the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16.

*United States v. Gabrion*, 719 F.3d 511, 522 (6th Cir. 2013). With these concepts in mind, I turn to the disputed discovery.

### 1. *Ogden Memo*

Mr. Con-Ui requests that I issue an order requiring the Government to assure compliance with the Ogden Memo. In the alternative, Mr. Con-Ui asks that I "confirm whether or not the government has complied with the Ogden Memo with respect to its discovery obligations. (Doc. 887, 17.)

The Ogden Memo was issued on January 4, 2010 by Deputy Attorney General David W. Ogden and was entitled "Guidance for Prosecutors Regarding Criminal Discovery".[8] (Doc. 887, 16-17; Doc. 889, 24.) The Government argues that the memo does not create enforceable rights and an order requiring compliance would be unenforceable because the "memo is phrased in terms of judgment calls. . .as opposed to absolutes." (Doc. 889, 25.) Mr. Con-Ui admits that the memo does "not create additional 'enforceable rights' for defendants," but argues it "does incorporate legally enforceable discovery obligations that already exist." (Doc. 887, 16.)

I agree that the memo does not create any additional enforceable rights for defendants. I have previously declined to order the Government to certify its compliance with the "Ogden Memo", and I will not do so in this case. *See United States v. Musto*, 2011 WL 2015223, at *3 (M.D. Pa. May 24, 2011). Therefore, the requests for certification of compliance with the Ogden Memo will be denied.

### 2. *Supplemental Nationwide BOP Data*

Mr. Con-Ui previously requested nationwide data from the BOP (*See* Doc. 150, ¶¶ 23(uu)-(vv), and I granted in part and denied in part his request (Doc. 603, 4.). The BOP was ordered to provide certain categories of data regarding inmates at USP Canaan for the

---

[8] The text of the memo can be accessed at: https://www.justice.gov/dag/memorandum-department-prosecutors. (Last accessed July 20, 2016).

years of 2009, 2010, 2011, 2012, and 2013. (Doc. 604, 4.) Mr. Con-Ui again requests nationwide BOP data, but argues that his current request is more narrowly tailored and the data requested "has been deemed essential by defense experts" (Doc. 887, 17.), and is alleged to be "critical to providing an individualized evaluation of Mr. Con-Ui's behavior in comparison" to various categories of inmates in the federal BOP. (Doc. 872-1, 23.) Further, Mr. Con-Ui argues that the discovery is necessary because "[t]here is simply no realistic possibility, given the facts of the case and the alleged acts of prison violence by Mr. Con-Ui that the government intends to introduce, that the issue of future danger will not be implicitly triggered." (Doc. 887, 18-19.) Additionally, Mr. Con-Ui intends "to introduce evidence he will not be a danger in the BOP", and cautions that denial of the request for BOP data "may well place the outcome of the trial in jeopardy." (*Id.* at 18-20.) The Government opposes Mr. Con-ui's request. (Doc. 889, 26-32.)

Both parties cite decisions from other capital cases that support their respective positions. (*See* Doc. 887, 20-21; Doc. 889, 26-32; Doc. 893, 24-30.) Mr. Con-Ui asserts that similar data "has been routinely turned over in other federal capital cases, in order to prepare for trial." (Doc. 887, 17; *see also* Doc. 872, 4-6; citing *United States v. Sablan*, No. 08-cr-0259 (E.D. Cal.); *United States v. Watland*, No. 11-cr-0038 (D. Colo.); *United States v. Richardson*, No. 08-cr-139 (N.D. Ga.); *United States v. McCluskey*, No. 10-cr-2734 (D.N.M.); and *United States v. Caro*, No. 06-cr-0038 (D. Colo.)). The Government argues that similar requests for data have been denied by other courts and the data is not material to mitigation because future dangerousness will no longer be argued by the Government. *See e.g., United States v. Caro*, 461 F. Supp. 2d 478, 481 (W.D. Va. 2006), aff'd, 597 F.3d 608 (4th Cir. 2010); *United States v. Lujan*, No. 05-0924 CR (D.N.M. filed September 8, 2011); *United States v. Umana*, No. 08-CR-134 (W.D.N.C. filed April 19, 2010) (unpublished). Mr. Con-Ui counters the Government's opposition arguing that "it is surely relevant that Mr. Con-Ui can be safely controlled in the future by the Federal Bureau of Prisons," and also argues that the cases cited by the Government are distinguishable. (Doc. 893, 20-21; 26-29.)

Mr. Con-Ui attaches the specific requests to his memorandum of law in support of his motion. (Doc. 872-1, 23-31.)The requests are as follows:[9]

    a.    Homicides by Inmates of either other inmates or staff: List of BOP homicides including dates, location, perpetrator and victim name, along with the register number, from 1980-2015[10]; Inmate discipline data[11] for each perpetrator and victim; sentence monitoring computation data for each perpetrator and victim; inmate profile form for each perpetrator and victim; assignment history for each perpetrator and victim; inmate history–security threat group for each perpetrator and victim; inmate housing history for each perpetrator and victim; documents memorializing the inmate's criminal history for each perpetrator and victim; documents memorializing the inmate's education, work and programming history for each perpetrator and victim;

    b.    Staff Homicides Perpetrators[12]: sentence monitoring computation data for each; inmate profile form for each; assignment history for each; inmate history–security threat group ("STG") for each; inmate housing history for each; documents memorializing the inmate's criminal history for each; documents memorializing the inmate's education, work and programming history for each;

    c.    Administrative Maximum facility ("ADX") Inmates:

        1.    For inmates currently at ADX for a prison homicide: List of names and register number, date of entry and unit

---

[9] The request also asks that any data provided be in spreadsheet rather than PDF format and that a codebook be provided to describe the data elements contained in the spreadsheets. (Doc. 872-1, 24.)

[10] The request fails to specify a time period for all of the categories requested. It is assumed that the request is for data from 1980 to 2015 unless specifically indicated otherwise.

[11] Each request for Inmate Discipline data requests the "Chronological disciplinary record for each [inmate] during all BOP incarcerations, and during any period of incarceration in ADX (inmate discipline data chronological disciplinary record)" and therefore, a reference to "Inmate discipline data" refers to the entire quoted request without stating such in full.

[12] The table provided was omitted in an attempt to avoid violations of confidentiality. (*See* Doc. 872-1, 25.) As suggested by Mr. Con-Ui's experts, I will order that they sign a confidentiality agreement stating that they will not reveal any individual inmate data or reveal names of specific inmates. (*See* Doc. 872-1, 24.) Defense counsel is to assure that a confidentiality agreement is signed and forwarded to the Government.

9

       placement history at ADX and current placement unit;

    2. For inmates previously at ADX for a prison homicide: List of names and register number, dates of entry and discharge from ADX, and BOP housing history after leaving ADX, including prison release dates, if applicable.

    3. A list of inmates committing prison homicide that were never sent to ADX, including register number and post-homicide housing history;

  d. Death Row ("DR") inmates housed in Special Management Units ("SMU")[13]: List of names for all death row inmates along with Inmate discipline data; Additional Tracking Indicators ("ATI") (type of victim, weapon, severity of injury) for each inmate involved in 100,101 and 224 assaults; disciplinary hearing officer reports for 100, 101 and 224 involved assaults; mental health status code; gang affiliation and/or STG status; sentencing monitoring computation data form; inmate profile form; assignment history report; inmate history form; inmate housing history form; inmate education history; criminal history and offense[s] of conviction.

  e. Federal Death Sentence ("FDS") Inmates: List of names of all FDS inmates[14] along with inmate discipline data; current location of each; ATI for each involved in 100, 101, and 224 assaults; disciplinary hearing officer reports for 100, 101 and 224 involved assaults; mental health status code; any documents showing Institutional Risk Score; gang affiliation and/or STG status; sentencing monitoring computation data form; inmate profile form; assignment history report; inmate history form; inmate housing history form; inmate education history; data or documents memorializing the criminal history and offense[s] of conviction.

  f. Inmates Sentenced for Capital Homicide to Life Without Parole ("LWOP") after conviction by jury or by plea: List of names of all LWOP inmates along with inmate discipline data; current location of each; ATI for each involved in 100, 101, and 224 assaults; disciplinary hearing officer reports for 100, 101 and 224 involved assaults; mental health status code; any documents showing Institutional Risk Score; gang

---

[13] The request is for data regarding inmates housed in "SCU", however, it is assumed that "SCU" is a typographical error as there is no reference to "SCU" in the papers but rather "SMU's" or Special Management Units. (Doc. 872-1, 23-31.)

[14] Mr. Con-Ui's experts assert that a listing of Federal Death Sentence inmates was provided in "Appendix I". (Doc. 872-1, 27.) However, it is unclear what appendix is being referenced. Therefore, the defense experts will be required to submit the list of federal death sentence inmates along with the signed confidentiality agreement to the Government. *See* Note 11 *supra.*

      affiliation and/or STG status; sentencing monitoring computation data form; inmate profile form; assignment history report; inmate history form; inmate housing history form; inmate education history; documents memorializing the criminal history and offense[s] of conviction.

  g.    General Population Inmates at United States Penitentiaries ("USP") : Key Indicators/Strategic Support System ("KI/SSS") data for guilty findings of prohibited acts at each USP for 2010-2016; KI/SSS data for Injury Assessment for Acts of Inmate Misconduct for each USP for 2010 through 2016; Specify the number, percent, rate, per 1000 (or 5000) for 100-400 level offenses committed by inmates in USP's for 2010 through 2016.

  h.    Inmates housed in SMU: List of names of all SMU inmates and SMU location along with inmate discipline data; ATI for each involved in 100, 101, and 224 assaults; disciplinary hearing officer reports for 100, 101 and 224 involved assaults; mental health status code; any documents showing Institutional Risk Score; gang affiliation and/or STG status; sentencing monitoring computation data form; inmate profile form; assignment history report; inmate history form; inmate housing history form; inmate education history; data or documents memorializing the criminal history and offense[s] of conviction; KI/SSS Strategic Support System data for guilty findings of prohibited acts at each USP for 2010-2016; KI/SSS data for Injury Assessment for Acts of Inmate Misconduct for each USP for 2010 through 2016; Specify the number, percent, rate, per 1000 (or 5000) for 100-400 level offenses committed by inmates in USP's for 2010 through 2016.

  i.    For LWOP inmates:

      1.    Yearly totals of LWOP inmates for 2010-2016, including identification of the number and percent housed in either medium security or maximum-security facilities each year;

      2.    The number and percent of crimes committed by the LWOP inmates in medium and maximum-security facilities.

  j.    Additional data on male inmates only[15]

---

[15] Mr. Con-Ui's request also references the format of discovery that was turned over in other cases, which purportedly fails to "provide a correct comparative analysis of disciplinary infractions by LWOP inmates." (Doc. 872-1, 30.) The request was for data on male inmates in the Federal Bureau of Prisons ("FBOP") in the following format:

| Security level of offenses | All FBOP (minus USP's) | USP's (minus LWOP's) | Medium Security facilities (minus LWOP's) | LWOP in medium security facilities | LWOP in maximum security facilities |
|---|---|---|---|---|---|

Despite its contention that it will not argue Mr. Con-Ui's future dangerousness (Doc. 889, 19.), the Government will offer evidence of alleged acts of violence committed by Mr. Con-Ui, while both in and out of custody. (*See* Doc. 884, 4-6.) Mr. Con-Ui asserts that he will attempt to prove a lack of future danger and intends to introduce expert testimony to bolster his lack of future danger argument to the jury. Although I am not ruling at this time on the admissibility of any potential testimony or evidence, certain data may be material to Mr. Con-Ui's defense. His experts assert that the data is needed for an individualized comparison of Mr. Con-Ui to other inmates and [t]he analyses of such data would lend credence to [the expert's] testimony and conclusions regarding factors associated with violence risk assessment in the federal FBOP, and in particular as it relates to Mr. Con-Ui." (Doc. 872-1, 23.) Therefore, I will partially grant Mr. Con-Ui's request, but I will again deny Mr. Con-Ui's request for general inmate population data and for inmate data on all SMU inmates. Additionally, I will narrow the time frames from those requested as I believe that ten years worth of data, from 2005 to 2015, is a more reasonable time frame. Unless data from 2010 to 2016 was specifically requested, the data to be provided will be from 2005 through 2015. I will also deny Mr. Con-Ui's request for inmate data with regard to the victims of inmate homicides other than name and register number. The specific data to be provided is as follows:

a. List of BOP homicides including dates, location, perpetrator and victim names and register numbers, from 2005-2015; Inmate discipline data for each perpetrator; sentence monitoring computation data for each

---

| | | | | | |
|---|---|---|---|---|---|
| No Guilty findings | | | | | |
| 100 | | | | | |
| 200 | | | | | |
| 300 | | | | | |
| 400 | | | | | |

I will not grant this request because I will not order that Mr. Con-Ui be provided data on general population inmates.

        perpetrator; inmate profile form for each perpetrator; assignment history for each perpetrator; inmate history–security threat group for each perpetrator; inmate housing history for each perpetrator; documents memorializing the inmate's criminal history for each perpetrator; documents memorializing the inmate's education, work and programming history for each perpetrator;

b.    For each of the ten staff homicide perpetrators listed (*see* Doc. 872-1, 24.): sentence monitoring computation data; an inmate profile form; assignment history; the inmate history–security threat group; the inmate housing history; documents memorializing the inmate's criminal history; documents memorializing the inmate's education, work and programming history;

c.    Administrative Maximum facility ("ADX") Inmates:

        1.    List of names and register number of inmates currently at ADX for a prison homicide; the date of entry and unit placement history at ADX and current placement unit;

        2.    List of names and register numbers for inmates previously at ADX for a prison homicide, beginning with 2005 to present; dates of entry and discharge from ADX, and BOP housing history after leaving ADX, including prison release dates, if applicable;

        3.    From 2005 to the present, a list of inmates committing prison homicide that were never sent to ADX, including register number and post-homicide housing history;

d.    List of names for all death row inmates along with Inmate discipline data from 2005 to 2015; including Additional Tracking Indicators ("ATI") (type of victim, weapon, severity of injury) for each inmate involved in 100,101 and 224 assaults; disciplinary hearing officer reports for 100, 101 and 224 involved assaults; mental health status code; gang affiliation and/or STG status; sentencing monitoring computation data form; inmate profile form; assignment history report; inmate history form; inmate housing history form; inmate education history; criminal history and offense[s] of conviction.

e.    List of names of all FDS inmates along with inmate discipline data; current location of each; ATI for each involved in 100, 101, and 224 assaults; disciplinary hearing officer reports for 100, 101 and 224 involved assaults; mental health status code; any documents showing Institutional Risk Score; gang affiliation and/or STG status; sentencing monitoring computation data form; inmate profile form; assignment history report; inmate history form; inmate housing history form; inmate education history; data or documents memorializing the criminal history and offense[s] of conviction.

f.    List of names of all LWOP inmates sentenced for capital homicide

       from 2005 to 2015, along with inmate discipline data; current location of each; ATI for each involved in 100, 101, and 224 assaults; disciplinary hearing officer reports for 100, 101 and 224 involved assaults; mental health status code; any documents showing Institutional Risk Score; gang affiliation and/or STG status; sentencing monitoring computation data form; inmate profile form; assignment history report; inmate history form; inmate housing history form; inmate education history; documents memorializing the criminal history and offense[s] of conviction.

    g.    For LWOP inmates:

        1.    Yearly totals of LWOP inmates for 2010-2016, including identification of the number and percent housed in either medium security or maximum-security facilities each year;

        2.    The number and percent of crimes committed by the LWOP inmates in medium and maximum-security facilities.

### *3.  Chaplain Osuji*

I previously ordered that the Government was to provide to Mr. Con-Ui: "all reports, memorandum, video and audiotapes, emails and any other information regarding post-incident communication between Mr. Con-Ui and Chaplin Ngozi Osuju." (Doc. 603, 5.) Mr. Con-Ui now seeks to compel the Government's compliance with the May 8, 2015 Order asserting that Mr. Con-Ui has not yet received certain video surveillance, notes, and emails. (Doc. 872, 9.) I will again order that the Government provide "all reports, memorandum, video, and audiotapes, emails and any other information regarding post-incident communication between Mr. Con-Ui and Chaplin Ngozi Osuju."

### *4.  Job Performance Evaluations*

Mr. Con-Ui also requests the "performance/job evaluation records for all correctional officers who worked in [the] C-Unit while Mr. Con-Ui was housed there" from September 10, 2011 to February 25, 2013.[16] (Doc. 872, 10.) Mr. Con-Ui asserts his experts need these

---

[16] The Government asserts that "there is no way to determine who 'worked' in the C-Unit from 2011-2013 or how that term is defined" therefore, "this request would pertain to every Canaan employee who had access to the C-Unit during this three-year period." (Doc. 889, 40 n. 5.) In light of my ruling, I am confident the parties can come to an agreement as to the scope of this request.

documents "in order to assess the conditions within the housing unit at the time of the assault on Officer Williams." (*Id.* at 10.) The Government opposes the request asserting that there is no "basis to believe that job performance evaluations will speak to anything related to this case or be more helpful . . . to assist defendant in presenting mitigating evidence with respect to his state of mind."  (Doc. 889, 40.) The Government also opposes the request, asserting Privacy Act concerns. (*Id.* at 41-42 (citing Privacy Act of 1974, 5 U.S.C. § 552a(b); *United States v. Henthorn*, 931 F. 2d 29, 30-31 (9th Cir. 1991).)

As I previously ordered that discovery related to staff misconduct at USP Canaan was to be provided to Mr. Con-Ui, I will additionally order that the USP Canaan C-Unit job performance evaluations of the corrections officers assigned to the C-Unit from September 10, 2011 to February 25, 2013 also be provided subject to a protection order. The parties are to agree upon a confidentiality agreement/protective order protecting the privacy of the BOP corrections officers and employees and present it to the court for approval.  Once approved, the evaluations are to be produced.

### 5. *Inmate Rosters*

Mr. Con-Ui requests the roster of the inmates housed in the same units as Mr. Con-Ui on November 21, 2010 while at USP Pollock , and on October 23, 2009 while he was at USP Victoryville.  (Doc. 872, 10-12.) In the amended notice of intent, the Government intends to introduce evidence of alleged violent acts on Mr. Con-Ui's part while an inmate at both facilities. (*See* Doc. 884, 5.) Mr. Con-Ui requests the rosters "[i]n order to conduct a meaningful investigation." (Doc. 887, 28-29; Doc. 872, 12.) The Government opposes both requests contending that Mr. Con-Ui's stated need for the rosters is "a fishing expedition" and that the "defense offers only mere speculation that the information may aid their investigation . . . [therefore the] request[s] should be denied pursuant to both Rule 16 and *Brady*. (Doc. 889, 46-47; 49-50.)

Because the Government intends to introduce alleged acts by Mr. Con-UI, I will order that the rosters be provided to allow for investigation.

15

### 6. *OSHA*

Mr. Con-Ui requests all communications concerning the death of Officer Williams between USP Canaan personnel, Occupational Safety and Health Administration ("OSHA") personnel, and the United States Attorney's Office in Harrisburg, PA. (Doc. 872, 17.) Mr. Con-UI contends that "[t]he correspondence [between OSHA and U.S. Attorney Peter J. Smith] and other communications by investigators to OSHA are material to the defense mitigation case and raise the possibility the Government intentionally suppressed the development of mitigation evidence" and "[o]nly a complete disclosure of the communications [between] U.S. Attorney Peter J. Smith and OSHA will allay, or support, the concerns of the defense." (Doc. 887, 31.) The Government opposes Mr. Con-Ui's request asserting that the disclosure of any communications made by an attorney for the government or prosecuting agency in connection with an investigation is expressly proscribed by Federal Rule of Criminal Procedure Rule 16(a)(2)[17]. (Doc. 889, 55.)

I will not order the Government to disclose any additional communications or correspondence. The parties do not dispute that an OSHA investigation was conducted nor that Mr. Con-Ui received a copy of the report. Mr. Con-Ui is simply speculating that there may be something to help his case but he has failed to demonstrate any factual basis for why the correspondence or communications are material to mitigation evidence. I will deny Mr. Con-Ui's request for correspondence or communications between OSHA, USP Canaan and the U.S. Attorney's Office.

---

[17]

> (2) Information Not Subject to Disclosure. Except as permitted by Rule 16(a)(1)(A)-(D), (F), and (G), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case. Nor does this rule authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500.

Fed. R. Crim. P. 16.

### 7. *ADX Contraband*

Mr. Con-Ui is alleged to have had contraband in his cell on January 30, 2014 while an inmate at ADX. (Doc. 872, 18.) The Government stated it will not introduce this evidence in its case in chief, however, it may seek to introduce evidence of the alleged possession of contraband to rebut any attempts by Mr. Con-Ui to demonstrate his lack of future danger. (Doc. 889, 58.) Therefore, Mr. Con-Ui requests all investigative reports, forensic analysis, chain-of-custody reports, expert reports and conclusions, and notices of experts that may be presented by the Government pertaining to this allegation. (Doc. 872, 18.) Mr. Con-Ui also requests the ADX "shakedown" logs detailing the seizure of contraband for the calendar years of 2012, 2013 and 2014; a list of all disciplinary allegations and findings of contraband at ADX during 2012, 2013 and 2014; and all BOP materials pertaining to the seizure of "stringers" for the years 2012, 2013 and 2014. (Doc. 872, 18-19.) Mr. Con-Ui asserts the requested discovery is needed by his BOP experts to investigate allegations, assist defense counsel and prepare to testify. (Doc. 872, 19.) The Government opposes Mr. Con-Ui's request because the "defendant fails to state how or why or under what precedent he is entitled to a monumental amount of discovery to investigate a potential line of government cross-examination." (Doc. 889, 58.)

Because it is clear that the Mr. Con-Ui intends to introduce evidence of his lack of future danger and the Government's stated desire to rebut such if necessary, I will grant Mr. Con-Ui's request. There is some dispute about the nature of the alleged contraband itself and therefore, the requested discovery is warranted.

### 8. *Documents Underlying Studies*

Mr. Con-Ui requests the "underlying documents and data used to compile the 2012 USP Canaan Institutional Character Profile "ICP" and 2013 Social Climate ("SC") studies received in discovery." (Doc. 887, 20.) Mr. Con-Ui's request is premised on his assertion that the "documents may shed light on the conditions at USP Canaan during the relevant time period." (Doc. 887, 32-33.) The Government contends that Mr. Con-Ui's request is no more than a "generalized fishing expedition, without any specific nexus to materiality," and

17

therefore, it should be denied. (Doc. 889, 59.)

The Government provided the studies to Mr. Con-Ui and has indicated that if Mr. Con-Ui argues the conditions of USP Canaan in mitigation, it may rebut Mr. Con-Ui's evidence by presenting the study that showed that "USP Canaan 'is a very well managed institution.'" (Doc. 889, 60.) Because the studies have already been provided and may be presented by the Government, the data forming the basis for the studies' results should be disclosed to the extent such data exists.[18] I will grant Mr. Con-Ui's request.

### III. Conclusion

For all of all of the foregoing reasons, I will grant in part and deny in part Mr. Con-Ui's Motion to Compel Compliance With This Court's Order of May 8 and Request for Additional Discovery.

An appropriate order follows.

August 4, 2016  /s/ A. Richard Caputo
Date  A. Richard Caputo
United States District Judge

---

[18] According to the Government, "the individual questionnaires and notes from interviews (to the extent they ever existed), were not maintained" and "[t]o the extent any data exists from the questionnaires, it is not in a form that can be attributed to any inmate or any unit, but rather, consists of generalized comments that were incorporated in the overall report findings." (Doc. 889, 61.) Mr. Con-Ui is to be provided any existing data or documents used to support the studies' findings, no matter the format.