**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA

v.

JESSIE CON-UI,

Defendant.

No. 3:13-CR-123

(JUDGE CAPUTO)

### MEMORANDUM

Presently before me are multiple motions *in limine* filed by Defendant Jessie Con-ui (Docs. 922, 934, 950). For the reasons that follow: (1) Mr. Con-ui's Motion *in Limine* to Exclude the Presentation of the "Video-tape of the Murder," Photographs of Blood-stained Keys and Clothing, and Post-mortem Photographs of the Victim's Body (Doc. 922, at 36), and Mr. Con-ui's Motion *in Limine* to "Limit the Evidence on the Statutory Aggravating Factor That the Murder of Officer Williams was Especially Heinous, Cruel and Depraved" (Doc. 922, at 52) will be GRANTED in part and DENIED in part; (2) Mr. Con-ui's Motion *in Limine* to Limit Victim-Impact Evidence to Members of the Victim's Family (Doc. 922, at 73) will be DENIED; (3) Mr. Con-ui's Motion *in Limine* to Exclude any Evidence That Is Not Particularly Relevant to One or More of the Statutory and Non-statutory Factors Alleged in the Amended Notice of Intent to Seek the Death Penalty (Doc. 922, at 42) will be NOTED; (4) Mr. Con-ui's Motion *in Limine* to Limit Proof of the Aggravating Factors Only to Those Facts Necessary to Establish a Conviction (Doc. 922, at 43) will be DENIED; (5) Mr. Con-ui's Motion *in Limine* to Bar Duplicative Use of Certain of the Aggravating Factors and Evidence (Doc. 922, at 47) will be DENIED; (6) Mr. Con-ui's Motion *in Limine* to Limit or Exclude Evidence Related to Mr. Con-ui's Alleged Participation in Additional Uncharged Acts of Serious Violence and Attempted Acts of Serious Violence (Doc. 922, at 52) will be GRANTED in part and DENIED in part; (7) Mr. Con-ui's Request for a Reliability Hearing (Doc. 922, at 20) will be DENIED; (8) Mr. Con-ui's Motion *in Limine* to Exclude From All Phases of the Penalty Case Evidence That Does Not Meet the Standards of *Crawford v. Washington*, 541 U.S. 36 (2004) (Doc. 922, at 25) will be GRANTED in part and DENIED in part; (9) Mr. Con-ui's Supplemental

Motion *in Limine* to Exclude Numerous Recently-Provided Photographs Related to the Murder and Firearms Convictions Alleged in the Notice of Aggravating Factors (Doc. 934) will be DEFERRED to the time of trial; (10) Mr. Con-ui's Second Supplemental Motion *in Limine* to "Exclude Numerous Recently-Provided Autopsy Photographs, an Enhanced Version of the Video of the Murder, Still Photographs of the Murder from the Video, and a Sentencing Memorandum by the State Prosecutor in Mr. Con-ui's Arizona Murder Conviction" (Doc. 950) will be DENIED in part, GRANTED in part, and DEFERRED to the time of trial in part; and (11) Mr. Con-ui's request for an Amended Informational Outline (Doc. 922, at 12) will be DENIED.

## I. Factual Background

Defendant Jessie Con-Ui is charged by indictment with two capital offenses and one non-capital offense. (Doc. 1). Counts One and Two of the indictment allege that, on February 25, 2013, Mr. Con-ui, while an inmate at the Canaan Federal Correctional Complex, committed a first-degree murder of Federal Corrections Officer Eric Williams ("Officer Williams"), in violation of 18 U.S.C. §§ 1111 and 1114(1). Count Three alleges that Mr. Con-ui knowingly possessed a prohibited object, namely, a sharpened weapon commonly known as a "shiv" or a "shank," in violation of §§ 1791(a)(2), (d)(1)(B), and (b)(3).

The trial commences on April 24, 2017. On November 7, 2016, Mr. Con-ui filed the instant motions *in limine* and raised several additional issues for consideration. (Docs. 922, 934, 950). Oral argument on these motions was heard on January 11, 2017. The motions have been fully briefed and are now ripe for disposition. I will address each in turn.

## II. Discussion

I.    **Mr. Con-ui's Motion *in Limine* to Exclude the Presentation of the "Video-tape of the Murder," Photographs of Blood-stained Keys and Clothing, and Post-mortem Photographs of the Victim's Body. (Doc. 922, at 36).[1]**

Mr. Con-ui asks that the Court preclude the presentation of:

(a)    the video of "the actual murder of Officer Williams" (Doc. 922, at 37), and, in the alternative, allow selected stills from the video or the testimony of a witness who has viewed the video as to its contents;

(b)    twenty-four (24) post-mortem photographs of Officer Williams' unclothed body displayed on an autopsy table;

(c)    Officer Williams' bloody clothing and the blood-stained keys he was carrying; and

(d)    Mr. Con-ui's bloody clothing.

*Id.* at 36-37. I will address each in turn.

### A.    The Video of the Crime Charged[2]

The video, described in sufficient detail in Mr. Con-ui's (Doc. 922, at 37) and the government's (Doc. 932, at 46-47) motions, depicts not only the crime charged, but also events leading up to it and the subsequent response by the prison staff. Mr. Con-ui concedes that "the video is highly probative of the circumstances of the murder" (Doc. 922, at 28), but argues nevertheless that because "the probative value of the evidence is such

---

[1] Mr. Con-ui's Motion *in Limine* to "Limit the Evidence on the Statutory Aggravating Factor That the Murder of Officer Williams was Especially Heinous, Cruel and Depraved" (Doc. 922, at 52) is subsumed under the disposition of this motion.

[2] Although there are several videos of the incident, each capturing a different angle, I will refer to all of them collectively as "the video," as did both parties. Further, although the video depicts not only the crime charged, but also events leading up to it and the response by the Bureau of Prisons' staff, Mr. Con-ui challenges only the presentation of the portion of the video depicting "the actual murder of Officer Williams." Doc. 922, at 37. Thus, I express my opinion only as to the admissibility of that portion of the video.

that its blinding impact will prevent or substantially impair the ability of jurors to consider and weigh evidence in mitigation, the unfairly prejudicial value of the evidence is manifest and should be excluded." (*Id.* at 29) (footnote omitted). According to Mr. Con-ui, "[i]t is difficult to imagine that any [person] could receive a fair trial or that any jury could consider anything but a verdict of death after seeing the video." (*Id.* at 28). Thus, Mr. Con-ui argues that because the presentation of the video may undermine the jury's constitutional obligation to consider a life sentence, the video ought to be excluded.

However, ascertaining the truth is the jury's most critical function. *See Tehan v. Shott*, 382 U.S. 406, 416, 86 S.Ct. 459 (1966). In the instant case, the truth has been preserved on a recording. The video depicts Officer Williams as he is kicked down a flight of stairs, his efforts to escape, the infliction of over 200 stab wounds, kicks to the head, and other acts of violence. The video captures the very crime with which Mr. Con-ui is charged. It is not a photograph of the event from which the factfinder must infer what happened. What is captured on the video is exactly what happened. No witness is needed to relate what happened; no photographs taken after the fact are needed to aid in the determination of what happened; no other evidence is needed to assist in the determination of what happened; and, of importance, no determinations as to credibility are needed to evaluate the video. There the crime charged is, and the jury ought to have the most dependable evidence from which to decide this case.

Under Federal Rule of Evidence 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Thus, when determining whether evidence violates Rule 403, courts must balance the probative value of the evidence against its prejudicial effect. *United States v. Guerrero*, 803 F.2d 783, 785 (3d Cir. 1986).

I first note the dearth of capital cases in which the admissibility of a video capturing the crime was at issue. Notably, Mr. Con-ui does not cite to a criminal case which excluded

such a video.[3] The standards governing the exclusion of a murder video, however, are the same as those governing the exclusion of any other piece of evidence alleged to be unfairly prejudicial. Thus, analogizing to photographic evidence might prove instructive.

Generally, appellate courts have been reluctant to overturn determinations by district courts that photographs, even particularly "gruesome" ones, are not unfairly prejudicial and are, therefore, admissible. *See, e.g., United States v. Fields*, 483 F.3d 313, 354 (5th Cir. 2007); *United States v. Rodriguez–Estrada*, 877 F.2d 153, 155–56 (1st Cir.1989). This has been true even if the photographs are probative of a relevant, yet undisputed, fact. *Old Chief v. United States*, 519 U.S. 172, 186-87 (1997). Moreover, as the Tenth Circuit has stated, "[g]ruesomeness alone does not make photographs inadmissible." *United States v. Naranjo*, 710 F.2d 1465, 1468 (10th Cir.1983). In fact, "admitting gruesome photographs of the victim's body in a murder case ordinarily does not rise to an abuse of discretion where those photos have nontrivial probative value." *Fields*, 483 F.3d at 355; *see also Kuntzelman v. Black*, 774 F.2d 291, 292–93 (8th Cir.1985) (*per curiam*) (holding that the admission of "flagrantly gruesome" photographs did not violate the petitioner's right to due process because the photos "were at least arguably relevant and probative"); *United States v. Treas–Wilson*, 3 F.3d 1406, 1410 (10th Cir.1993) (autopsy and crime scene photographs, though graphic, were relevant to the determination of the defendant's intent and state of mind).

Although no case is the same, and analogizing to photographs may be difficult, the above-cited authority does confirm, however, that no fixed rules apply to the careful balancing of fact-specific concepts like probativeness and unfair prejudice in considering the admission of an undeniably gruesome evidentiary material.

---

[3] The Third Circuit recently published a decision which does involve the issue of admissibility of a murder video. In *United States v. Bailey*, 840 F.3d 99 (3d Cir. 2016), the court held that the district judge should not have admitted the video. The case is inapposite here, however. The defendants in that case were tried on firearm possession and drug trafficking charges, not a murder charge, and the admitted video depicted murder carried out not by the defendants, but by their co-conspirator, who was tried separately.

I have independently examined the video at issue and find that it should not be excluded. I do not find that the video is merely "dragged in by the heels for the sake of its prejudicial effect," *Fields*, 483 F.3d at 354 (citation omitted), nor is there a "genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." *United States v. Powers*, 59 F.3d 1460, 1467 (4th Cir. 1995). The term "unfair prejudice," as applied to a criminal defendant, "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief*, 519 U.S. at 180, 117 S.Ct. at 650. Here, the video depicts the very events underlying the murder charges against Mr. Con-ui, making it both relevant and highly probative on a number of issues of consequence that only the video can capture. The video at issue allows the jury to be a witness to the crime charged, and by having a more vivid picture of the incident, the jury might, for instance, be in a better position to make inferences about Mr. Con-ui's intent. More importantly, because the video captures conscious physical suffering by Officer Williams which did not stop Mr. Con-ui from further attacks, it is highly probative of Mr. Con-ui's intent to kill and consciousness of guilt. *See United States v. Pinke*, 614 Fed. Appx. 651 (4th Cir. 2015) (finding that the district court did not abuse its discretion in admitting videos of defendant assaulting another inmate and resulting injuries); *United States v. Patrick*, 513 Fed. Appx. 882 (11th Cir. 2013) (reversing a district court's exclusion of prison assault videos because they were "relevant and highly probative" to proving the crime).

On the other side of the equation, I find that the presentation of the video would not be unfairly prejudicial.[4] The video is of good enough quality to allow the viewer to discern the movement of the persons involved, but of poor enough quality to guard against exposing the jury to gruesome depictions of the body, wounds, blood, and gore. The actions depicted

---

[4] "Virtually all evidence is prejudicial—if the truth be told, that is almost always why the proponent seeks to introduce it—but it is only the *unfair* prejudice against which the law protects." *United States v. Pinillos–Prieto*, 419 F.3d 61, 72 (1st Cir.2005).

in the video occur at some distance from the camera, which further alleviates concerns of the video's prejudicial impact. In fact, compared to what modern audiences are exposed to in the media, the video is somewhat muted for a crime of this magnitude and presents a soundless and largely bloodless version of the events. There is no close-up of the victim's or Mr. Con-ui's face, nor does the video show in any detail the injuries Officer Williams suffered as a result of the attack. "[H]owever, the vicious, brutal nature of a defendant's conduct is not itself sufficient to justify a complete exclusion of evidence tending to show the defendant engaged in those acts." *United States v. Lujan*, 603 F.3d 850, 858 (10th Cir. 2010). Here, there is no "tendency to show"; the video *shows* the crime charged.

Moreover, the government is "not required to sanitize its case because the victim has died," *United States v. Werther*, 2013 WL 1410136 *1 (E.D. Pa. 2013), nor will I allow Mr. Con-ui "to benefit from a Rule 403 exclusion for unfair prejudice simply because [his] conduct was of a grisly nature." *Lujan*, 603 F.3d at 858. Otherwise, "the capital defendant would be rewarded for his greater level of violence . . . because the more heinous nature of the acts would make it more likely that the district court would exclude evidence of those acts . . . on the grounds of unfair prejudice." *Id.* at 858–59. *See also United States v. Smith*, 459 F.3d 1276, 1296 (11th Cir. 2006) ("That the nature of the crime itself, and therefore the nature of the evidence tending to prove it, is emotionally charged does not mean that the prosecution must be deprived of its most probative evidence."). "In a criminal trial, a jury is entrusted with the weighty obligation to find the facts and it is incompatible with that degree of trust to attempt to protect them from the evidence of the crime." *United States v. Tsosie*, 288 F. App'x 496, 500 (10th Cir. 2008) (citation and quotation marks omitted).

Mr. Con-ui's apparent willingness to concede certain facts, or conceding guilt, does not make the video irrelevant.[5] As the Supreme Court explained, "evidentiary relevance

---

[5] In case Mr. Con-ui concedes guilt, the government would still be "obliged to present during the guilt phase competent, admissible evidence establishing the essential elements of the crimes with which [the defendant] was charged . . . [and] the defense reserve[s] the right to cross-examine witnesses for the prosecution and could endeavor . . . to exclude prejudicial

under Rule 401" is not "affected by the availability of alternative proofs," such as a defendant's admission, and that the exclusion of relevant evidence "must rest not on the ground that other evidence has rendered it 'irrelevant,' but on its character as unfairly prejudicial." *Old Chief*, 519 U.S. at 179, 117 S.Ct. at 649–50. Thus, Mr. Con-ui's potential concession as well as the proposed alternatives to showing the video do not undermine the high probative value of the video. *See United States v. Sampson*, 486 F.3d 13, 43-44 (1st Cir. 2007) (upholding the admission of autopsy photographs because they shed light on the manner in which each victim was killed; noting that although the government had other means of making its points, "within reasonable limits, the prosecution-even in a capital case-is entitled to present its case through the evidence it deems most appropriate") *See also United States v. Salameh*, 152 F.3d 88, 122–23 (2d Cir. 1998) (no abuse of discretion to admit a "significant" number of "graphic" and "disturbing" photos of World Trade Center bombing victims, including corpse of a pregnant woman, despite defendants' stipulation offer). While prosecutorial need alone does not mean that probative value always outweighs prejudice, *United States v. Frick*, 588 F.2d 531, 538 (5th Cir. 1979), the more essential the evidence, the greater its probative value, and the less likely that a trial court should order the evidence excluded. *See United States v. Mills*, 704 F.2d 1553, 1560 (11th Cir.1983). As the Supreme Court has held, absent exceptional circumstances, "the prosecution is entitled to prove its case by evidence of its own choice" and a "criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it." *Old Chief*, 519 U.S. at 186–87, 117 S.Ct. at 653. The full evidentiary force of the video is self-evident; it is the centerpiece of the government's case.

---

evidence." *Florida v. Nixon*, 543 U.S. 175, 176, 125 S. Ct. 551, 554 (2004). However,"[b]y entering a guilty plea, a defendant waives constitutional rights that inhere in a criminal trial, including the right to trial by jury. . . . " *Boykin v. Alabama*, 395 U.S. 238, 243 (1969). Thus, Mr. Con-ui's concession of guilt alone (without a formal withdrawal of his not guilty plea), does nothing to remove or lessen the government's burden "to put on 'complete proof' of guilt or persuade a jury of the defendant's guilt beyond a reasonable doubt." *Nixon*, 543 U.S. at 188 (citation omitted).

Of course, I am mindful of the reasons which underlie Mr. Con-ui's objections and arguments about the video's impact. Having considered this issue carefully, I have determined that the best course of action is to allow only one viewing of the video. The government will be permitted to show the video in its case-in-chief during the guilt phase, but no other presentations of the video will be permitted, either at the guilt or penalty stage.[6] The jurors will not be allowed to view the video again during their deliberations at either stage as the video will not be taken to the jury room.

Further, because no one angle captures all relevant events, the government will be permitted to edit the existing videos, which represent different angles of the incident, into one continuous, single-screen, video. The government may not enhance the video in any way, zoom in, or add any modifications except for arranging the sequence of the videos capturing different angles into one linear video.[7]

I am sensitive to the argument that the jury's decision of whether or not to impose the sentence of death cannot be made "based on . . . caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 357-58 (1977). However, my detailed jury instructions as well as the passage of time between the presentation of the video in the government's case-in-chief in the guilty phase and the jury's deliberation at the end of the penalty phase weeks later (including a break between the two phases) should soften those concerns.

As to my bar on the presentation of the video at the penalty stage, although I agree that the video is highly relevant in light of the statutory aggravating factors set out in the government's notice of intent, a second showing of the video would constitute merely "a graphic depiction of an event that had already been thoroughly proven." *United States v.*

---

[6] I reserve my judgment on the issue of whether the video will be shown during the penalty stage if Mr. Con-ui withdraws his plea of not guilty and the trial proceeds to the penalty phase without a determination of guilt by the jury.

[7] To be even more precise: only one angle may be shown at a time, and the edited video may not show the same conduct from different angles - only one angle may be chosen for each passing second.

*Bailey*, 840 F.3d 99, 122 (3d Cir. 2016). More importantly, the standard governing admission of evidence at the penalty phase is different. The Federal Death Penalty Act, 18 U.S.C.A. § 3591—3598 ("FDPA"), is more restrictive than Rule 403. Specifically, 18 U.S.C. § 3593(c) permits exclusion if probative value is outweighed by the danger of prejudice, while the Rule 403 standard allows exclusion only if the probative value is *substantially* outweighed by the danger of prejudice. The FDPA, however, eliminates considerations of undue delay, waste of time and needless presentation of cumulative evidence from the court's calculus. 18 U.S.C. § 3593(c).

A second showing of the video would greatly diminish its probative value. "Even though the two sets of videos were probative, . . . the law of diminishing marginal returns still operates. The probative value of each clip was reduced by the existence of the clips before it. . . . As a result, after one excerpt from each video was displayed, the probative value of the remaining excerpts became diminished because knowledge . . . had already been established . . . by the prior video excerpts." *United States v. Cunningham*, 694 F.3d 372, 389–90 (3d Cir. 2012). Thus, I find that the "aggregate risk of unfair prejudice" is high, while the probative value of a second showing of the video low. *Id.* at 390.

However, because a district court "is not required to scrub the trial clean of all evidence that may have an emotional impact," *United States v. Ganoe*, 538 F.3d 1117, 1124 (9th Cir. 2008), I will allow five (5) stills from the video at the penalty stage. Such stills would be probative by showing, for instance, that victim was alive and even conscious during the incident, that, even when faced with a badly injured victim, Mr. Con-ui did not stop from further attacks, and that Mr. Con-ui stopped the assault only to resume it a moment later after washing his hand. I find that the use of stills lessens the prejudicial impact enough to not run afoul of the FDPA's more restrictive balancing. The stills may still be gruesome, however, "[g]ruesome crimes result in gruesome photographs." *State v. Green*, 274 Kan. 145, 148, 48 P.3d 1276 (2002). *See also Gov't of V.I. v. Krepps*, 438 F. App'x 86, 88–89 (3d Cir.2010) (affirming decision to allow jury to view photos of victim's mummified and partially decomposed body). These still photographs have particular

10

probative value in light of the aggravating factors alleged by the government.

I am mindful of due process concerns in this case, generally. The Due Process Clause guards against situations when "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair." *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597 (1991) (citing *Darden v. Wainwright*, 477 U.S. 168, 179–83, 106 S.Ct. 2464 (1986)). Thus, I must ensure that the admission of evidence does not "so infect[] the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process." *Romano v. Oklahoma*, 512 U.S. 1, 12, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994). "[B]ecause a fundamental-fairness analysis is not subject to clearly definable legal elements, when engaged in such an endeavor a federal court must tread gingerly and exercise considerable self-restraint." *Duckett v. Mullin*, 306 F.3d 982, 999 (10th Cir.2002) (quotations omitted). I must ensure that Mr. Con-ui receives a fundamentally fair trial, a violation of which "could arise out of a single action or piece of evidence. It could also arise from the cumulative effect of a number of pieces of evidence in combination." *United States v. Sampson*, 335 F. Supp. 2d 166, 183 (D. Mass. 2004). Thus, I will permit only one showing of the video at the guilt phase, followed by a presentation of five (5) stills at the penalty stage.

## B.   Autopsy Photographs

Next, Mr. Con-ui asks that I preclude the presentation of twenty-four "(24) post-mortem photographs of Officer Williams' unclothed body displayed on an autopsy table." (Doc. 922, at 38).

The photographs show the victim's body from various angles and from various degrees of proximity. They all show the victim completely nude - the clothes apparently having been removed to facilitate the autopsy. Many show the size and shape of the wounds. The most disturbing of these show the victim's peeled off skin at the top of his head to facilitate the examination of the injuries to the head. That picture will be excluded from both phases of the trial. *See United States v. Rezaq*, 134 F.3d 1121, 1138 (D.C. Cir. 1998) (close-up photo of section of victim's skull, with skin removed, carried risk of

significant prejudice; court stated that "photographs of gore may inappropriately dispose a jury to exact retribution").

Courts routinely admit autopsy photographs, even particularly "gruesome" ones. *See, e.g., Fields*, 483 F.3d at 354 (13 gruesome autopsy photos and 19 crime scene photos showing victim's wounds had probative value and therefore were admissible); *Rodriguez–Estrada*, 877 F.2d at 155–56; *United States v. Eyster*, 948 F.2d 1196, 1212 (11th Cir. 1991) (photos of victim's charred remains properly admitted despite defense stipulation as to cause of death); *United States v. Soundingsides*, 820 F.2d 1232, 1242-43 (10th Cir. 1987) (gruesome autopsy photos that painted a clearer picture of the victim's injuries, cause of death, and the defendant's malice aforethought admissible); *Treas-Wilson*, 3 F.3d at 1410 (graphic crime scene and autopsy photos relevant and admissible to prove defendant's state of mind). However, in none of those cases the crime at issue was captured by a video recording; rather, in each case, autopsy photographs constituted the central evidence against the defendants and were often more probative of the intent to kill than any other piece of evidence. That is not the case here. Moreover, the brutality of the murder is not an element the government must establish at the guilt stage; rather, its focus is, *inter alia*, on premeditation, motive, and intent. The presentation of the video of the murder covers those elements exhaustively. Thus, to minimize the risk of any unfair cumulative effect, I will not permit any autopsy photographs at the guilt phase.

As to the penalty stage, because I find that the probative value of the autopsy photographs is not outweighed by their prejudicial effect, they will be permitted as especially relevant to the aggravating factor requiring the showing of serious physical abuse or torture at the time of the murder. The pictures, no doubt, are gruesome. However, given that one of the statutory aggravating factors is that the "defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim" 18 U.S.C. § 3592(c)(6), the rulemakers contemplated exposing the jury to evidence that would have to prove those very characteristics, and such evidence might often be graphic and disturbing. After all, evidence that intends to prove that a murder was

heinous must be capable of proving that, and cannot sanitize what it seeks to establish. As already mentioned, gruesome murders produce gruesome photographs. Thus, following other courts, the autopsy pictures will be admitted during the penalty phase. *See Sampson*, 486 F.3d at 43-44 (upholding the admission in a capital sentencing of autopsy photographs); *United States v. Ortiz*, 315 F.3d 873, 897 (8th Cir. 2002) (in capital case admission of graphic photos of bloody corpse that corroborated testimony of victim's murder and established that it was heinous and depraved not abuse of discretion).

The FDPA standard governing the admission of evidence at the penalty phase is more restrictive than Rule 403 by demanding exclusion if probative value is outweighed by the danger of prejudice (as opposed to "substantially" outweighed), and less restrictive by eliminating considerations of undue delay, waste of time and needless presentation of cumulative evidence from the court's calculus. 18 U.S.C. § 3593(c).

Thus, the rulemakers intended for the courts to apply greater scrutiny to the balancing of probativeness against any prejudicial effect, yet were less concerned with the cumulative effect of the evidence so long as it survives the initial balancing. However, I am, again, cognizant of the overarching due process concerns in this case. As already mentioned, a violation of Mr. Con-ui's due process right to a fair trial may "arise out of a single action or piece of evidence. It could also arise from the cumulative effect of a number of pieces of evidence in combination." *Sampson*, 335 F. Supp. 2d at 183. Here, although each autopsy picture may be admissible when examined individually, in the context of the admissibility of the murder video and in combination with other types of evidence, the aggregate effect may amount to a due process violation. Therefore, my ruling as to the admissibility of the autopsy pictures at the penalty phase is, in part, motivated by due process concerns which demand that I consider the case as a whole and assess the overall effect of all evidence which may involve the danger of unfair prejudice. I am also motivated by the diminished probative value of each additional picture depicting the same, or similar, condition. As the Third Circuit has stated in relation to video clips, "[t]he probative value of each clip was reduced by the existence of the clips before it. . . . As a result, after one

13

excerpt from each video was displayed, the probative value of the remaining excerpts became diminished because knowledge . . . had already been established . . . by the prior video excerpts." *Cunningham*, 694 F.3d at 389–90. Thus, the depravity of the crime charged can be proven without the need to display every single autopsy picture in order to mitigate against the risk that the aggregate effect of too many photographs will diminish their overall probative value and run afoul of 18 U.S.C. § 3593(c)'s balancing.

As such, although the challenged photographs have high probative value and "they are in no sense so shocking as to . . . unfairly prejudice[] the defendant," *Naranjo*, 710 F.2d at 1469, I will only permit five (5) autopsy photographs at the penalty phase. *See Ortiz*, 315 F.3d at 897 (admission of graphic photos of bloody corpse not abuse of discretion, as they corroborated testimony regarding victim's murder and established that it was heinous and depraved).

### C. Photographs of the Crime Scene

Mr. Con-ui also asks that I preclude the presentation of a number of photographs taken at the crime scene. Because they support the penalty phase aggravating factor that the crime was committed in a depraved and heinous manner, by, for instance, pointing to the victim's blood loss during the assault, I will allow one picture of the crime scene during the penalty phase. As to the guilt stage, crime scene photographs are cumulative in light of the admissibility of the video, and because they provide nothing in the way of new evidence, they will be excluded, given their low probative value.

However, a close-up picture of Officer Williams' face while he is carried on a stretcher will be permitted at both stages. It is the only picture depicting the extent of the injuries to his face shortly after the incident when the medical personnel tended to the injured victim. "The bloodied head and face of the victim gives an indication, although admittedly an imperfect one, of how the victim must have appeared to [the defendant] at the end of the [assault]. Without these photos, the prosecution would have been handicapped in its ability to convey the nature and extent of the beating to the jurors." *United States v. Sarracino*, 340 F.3d 1148, 1169 (10th Cir.2003). Therefore, I find that the danger of unfair

14

prejudice does not outweigh the photograph's high probative value. *See Sampson*, 335 F. Supp. 2d at 183 ("[T]he court admitted only a small subset of the proffered photographs. The photographs admitted were those that most closely depicted the condition of the victims at the time they were left by the defendant."); *Naranjo*, 710 F.2d at 1468 (admission of photograph depicting entry wound at the right upper lip of victim, "and a great deal of blood on the pillow, bedsheets, and the victim's face" was not "unduly nor designedly inflammatory").

### D. Photographs of Mr. Con-ui's Bloody Clothing

The pictures provided by the defense for *in camera* review do not readily show any blood on Mr. Con-ui's clothing. As such, their probative value is questionable. To the extent, however, that those or other photographs of Mr. Con-ui's clothing help link him to the crime charged because they were found in Mr. Con-ui's cell after the incident and have been positively tested for the victim's DNA, they will be permitted in the government's case-in-chief in the guilt phase.

### E. Photographs of Officer Williams' Bloody Keys and Clothing[8]

Preliminary, I find that the picture of Officer Williams' bloody keys has no probative value and will be excluded.

As to the photographs of the victim's bloody clothing, "[i]n homicide prosecutions, the general rule is that the clothing worn by the victim at the time of the killing is admissible in evidence, even where its introduction may be prejudicial to the accused." *Sampson*, 335 F. Supp. 2d at 184 (citation omitted). The Third Circuit also has held that "[p]istols, fruits of the crime, clothing, parts of the body of the person killed, everything pertaining to the crime which will aid the jury in its consideration of the (alleged) crime and the guilt or innocence

---

[8] The government, in its brief in opposition to Mr. Con-ui's motion *in limine*, argues in favor of the admissibility of other pieces of evidence, such as Officer Williams' radio or the murder weapons. (Doc. 932, at 49). Because, however, Mr. Con-ui's motion does not seek to exclude that evidence, I express no opinion as to its admissibility at this time and, if any additional challenges to the admissibility of evidence are brought by Mr. Con-ui, I will defer my judgment on those issues to the time of trial.

of the accused, is admissible. This has been the law for centuries." *United States v. Bamberger*, 456 F.2d 1119, 1127 n. 5 (3rd Cir. 1972) (citation omitted). *See also Todd v. Stegall*, 2000 WL 654960 (E.D. Mich. 2000) (commenting that victim's clothing properly was admitted to show the manner and means of the assault and ensuing death). However, "in the context of [a] capital case, there [may be] unique considerations that indicate[] that exclusion [is] appropriate." *Sampson*, 335 F. Supp. 2d at 184–85. As the *Sampson* court held,

> [w]hile the shirts were, as described above, relevant to material issues in this case, it is likely that the jury would not have considered them solely on those issues. During the trial, the prosecution produced evidence, especially through the confessions of the defendant, that was more directly probative of the intent element of serious physical abuse. Rather than as circumstantial evidence of intent, the jury would likely have regarded the shirts as powerful and immediate symbols of the victims and the brutality of their murders.

*Id.* at 185. Similarly, I find that, in the context of this case, the probative value of the victim's bloody clothing is low when balanced against the risk of unfair prejudice. First, the condition of the clothing as displayed in the photographs may not be the same as the condition of the clothing at the time of the assault because the clothes were removed and cut when rescuers attempted to revive Officer Williams. It is also likely that reanimation and rescue efforts increased the amount of blood on the clothes, which may distort the jury's understanding of the assault. Finally, the presence of the victim's flesh in the photographs strongly cautions against their admissibility. Because I fear that the clothing may be introduced "only to arouse and inflame the emotions of the jury," *State v. Steele*, 120 Ariz. 462, 586 P.2d 1274, 1277–78 (1978), they will be excluded.

## II.    Mr. Con-ui's Motion *in Limine* to Limit Victim-Impact Evidence to Members of the Williams Family. (Doc. 922, at 73).

Mr. Con-ui asks the Court to limit the scope of victim-impact testimony to exclude opinions about the crime, the Mr. Con-ui, and the appropriate sentence, and to confine victim-impact evidence to members of the Williams family only.

In *Payne v. Tennessee*, 501 U.S. 808 (1991), the Supreme Court, by reversing its

prior decision in *Booth v. Maryland*, 482 U.S. 496 (1987), sanctioned the use of "'victim-impact' evidence relating to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family." *Id.* at 817. The FDPA also explicitly refers to the "effect of the offense on the victim and the victim's family." 18 U.S.C. § 3593(a). However, although both *Payne* and the FDPA invoke the phrase "victim's family," which may suggest an important limitation on the scope of this type of evidence, "[c]ourts have interpreted *Payne* and the FDPA to permit similarly situated witnesses, i.e., family members, friends, and co-workers, to give victim-impact testimony." *United States v. Lawrence*, 735 F.3d 385, 405 (6th Cir. 2013). Indeed, allowing evidence from non-family members about their own grief and loss is consistent with an overwhelming weight of authority in this country. *See, e.g, United States v. Whitten*, 610 F.3d 168, 187-88 (2d Cir. 2010); *United States v. Bolden*, 545 F.3d 609, 626 (8th Cir.2008); *United States v. Fields*, 516 F.3d 923, 946 (10th Cir. 2008); *United States v. Barrett*, 496 F.3d 1079, 1099 (10th Cir. 2007); *United States v. Nelson*, 347 F.3d 701, 713-14 (8th Cir. 2003); *United States v. Bernard*, 299 F.3d 467, 478 (5th Cir.2002); *United States v. Battle*, 173 F.3d 1343 (11th Cir. 1999).

   Mr. Con-ui insists, however, that a recently decided case by the Supreme Court, *Bosse v. Oklahoma*, 137 S. Ct. 1, 1, 196 L. Ed. 2d 1 (2016) (*per curiam*) requires a reconsideration of the now well-settled principle that the scope of permissible victim-impact evidence extends to friends and co-workers. Mr. Con-ui contends that *Bosse*'s citation to *Payne* overrules or undermines the Second, Fifth, Sixth, Eighth, Tenth, and Eleventh Circuit decisions that explicitly allow victim-impact evidence from non-family members. I disagree.

   The principal problem with Mr. Con-ui's argument is his inaccurate reading of *Bosse* and his imprecise characterization of *Bosse*'s holding. Mr. Con-ui writes:

> *Bosse* underscores the fact that victim-impact evidence *remains limited* to "'victim impact' evidence relating to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family."

(Doc. 922, at 73-74) (citing *Payne*, 501 U.S. at 817) (emphasis added). However, *Bosse*

states merely that:

> the Court [in *Payne*] granted certiorari to reconsider [the] ban on victim impact evidence relating to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family.

*Bosse,* 137 S. Ct. at 1–2 (citation omitted). As such, nowhere does *Bosse* proclaim that victim-impact evidence "remains limited," as Mr. Con-ui claims, to members of the victim's family. In fact, the citation invoked by Mr. Con-ui appears in the second sentence of the *Bosse* decision and serves merely as an introductory background rather than a dispositive ruling on the admissibility of victim-impact testimony by friends and co-workers. Instead, the proper reading of *Payne*, and thus, *Bosse*'s reference to *Payne*, is merely that "the Eighth Amendment erects no *per se* bar" to the admission of victim-impact evidence and to prosecutorial argument on that subject. *Payne,* 501 U.S. at 827. Put simply, *Payne* held that the Eighth Amendment permits capital sentencing juries to consider victim-impact evidence from family members; it did not hold, as Mr. Con-ui appears to contend, that the Eighth Amendment limits capital sentencing juries to consider victim-impact evidence *only* from family members.

> At issue in *Payne* was testimony from a family member of the victims; but while the holding of *Payne* is therefore expressed in those terms, nothing in the Court's reasoning suggests that the principle is so limited. Elsewhere in the opinion, the Court states that a factfinder should be allowed to measure the "specific harm" the defendant caused by committing the murder, a phrase broad enough to embrace the loss felt by friends or co-workers who were close to the victim. The opinion refers repeatedly to the specific harm caused as encompassing loss felt by "community" or "society."

*Whitten*, 610 F.3d at 187–88 (internal citations omitted). More importantly, a distinction between victim-impact testimony by non-family and family members is a dubious one. The victim-impact evidence by a friend or co-worker may not be materially distinguishable from that offered by a sibling. Both may meaningfully touch upon the same issues of loss and grief. Mr. Con-ui's strict construction of the language in *Payne* would preclude any victim-impact statements in a case where the victim had no family but many friends, or preclude critical victim-impact testimony from a life-long, yet unmarried, partner of the victim. None of these issues were taken up by the Supreme Court in its short, *per curiam* decision in

*Bosse*, which focused on the *scope* of victim-impact testimony, rather than its *source*, as Mr. Con-ui seems to suggest.

Therefore, I join the overwhelming majority of courts in finding that "the Constitution allows evidence from non-family members about their own grief and about the loss felt by other non-family members," *Whitten*, 610 F.3d at 188, and nothing in *Bosse* requires me to reexamine that principle. Thus, Mr. Con-ui's motion will be denied.

As to the scope of victim-impact evidence, the limitations are well-established. The Supreme Court permits testimony which relates "to the personal characteristics of the victim and the emotional impact of the crimes[.]" *Payne*, 501 U.S. at 817. As *Bosse* recently reaffirmed, the admission of "characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment[.]" *Bosse*, 137 S. Ct. at 2 (quoting *Payne*, 501 U.S. at 830 n.2). I have no reason to doubt that the government is aware of these important limitations.

## III.   Mr. Con-ui's Motion *in Limine* to Exclude any Evidence That Is Not Particularly Relevant to One or More of the Statutory and Non-statutory Factors Alleged in the Amended Notice of Intent to Seek the Death Penalty. (Doc. 922, at 42).

Mr. Con-ui argues that the mere fact that certain evidence is admitted at the first stage of the trial does not make it automatically relevant on the issue of punishment. Mr. Con-ui would like to reserve the right to object to any evidence introduced at the first stage of the trial if the evidence is not also relevant on the issue of punishment. It is so noted.

## IV.   Mr. Con-ui's Motion *in Limine* to Limit Proof of the Aggravating Factors Only to Those Facts Necessary to Establish a Conviction. (Doc. 922, at 43).

Mr. Con-ui argues that the circumstances underlying each of the three convictions set out in the amended notice of intent are not particularly relevant to the sentencing decision, and the government should not be allowed to "re-try the facts and circumstances

of these three past offenses."[9] (*Id.* at 44). Specifically, Mr. Con-ui asks this Court to confine the government's proofs to documents that only establish the fact of the conviction because "[a]ny other course will require a trial-within-a-trial of the facts and circumstances of the underlying offenses." (*Id.* at 43-44).

I note at the outset that I will not allow the government to "re-try" the facts of Mr. Con-ui's previous convictions, nor will the presentation of evidence related to those convictions amount to a "trial-within-a-trial." That is, however, not to say that the government will only be permitted to introduce the mere fact of conviction.

Although sentencing is always a fact-intensive process, when a defendant is found guilty of a death-eligible offense, no pre-sentence report is prepared. 18 U.S.C. § 3593(c). Instead, during the penalty phase, "information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592." *Id.* As the Supreme Court has held, "[o]nce the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty . . . , the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446

---

[9] They are:

    (1)    Previous conviction of offense for which a sentence of death or life imprisonment was authorized. The defendant has previously been convicted of another state offense resulting in the death of a person, for which a sentence of life imprisonment was authorized by statute. 18 U.S.C. § 3592(c)(3).

    (2)    Previous conviction for a violent felony involving firearm. The defendant has previously been convicted of a State offense punishable by a term of imprisonment of more than one year, involving the use or attempted or threatened use of a firearm (as defined in 18U.S.C. § 921) against another person. 18 U.S.C. § 3592(c)(2).

    . . .

    (4)    Conviction for serious federal drug offense. The defendant has previously been convicted of violating Title II or III of the Comprehensive Drug Abuse Prevention and Control Act of 1970 for which a sentence of 5 or more years may be imposed. 18 U.S.C. § 3592(c)(12).

(Doc. 884, at 3-4).

(1983). "What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 878-79, 103 S.Ct. 2733 (1983) (emphasis in original); *see also Woodson v. North Carolina*, 428 U.S. 280, 303–304, 96 S.Ct. 2978, 2991 (1976) (plurality opinion).

The Supreme Court described the discretion afforded jurors in the process of individualized determination as "expansive," "wide," and "unbridled." *Tuilaepa v. California,* 512 U.S. 967, 973, 974, 979, 114 S. Ct. 2630, 2635, 2636, 2639 (1994). "[T]he selection decision focuses on whether a particular individual who is eligible for the death penalty should in fact receive that sentence or whether some lesser sentence is warranted." *Brecheen v. Reynolds*, 41 F.3d 1343, 1359–60 (10th Cir. 1994) (quoting *Tuilaepa,* 512 U.S. at 972). What lies behind the mere "fact of conviction" are nuances which individuate concrete convictions, and to not afford Mr. Con-ui a particularized sentencing would be to deprive him of his rights. *See Zant*, 462 U.S. at 873–880. Thus, the function served by the jury at the penalty phase is not to simply consider whether some abstract person with certain types of unparticularized convictions deserves the sentence of death, but rather, whether a particular defendant, given his particular criminal history, the incidence, cause, and features of his underlying convictions, and the particular circumstances that differentiate those crimes from others, deserves the sentence of death.

This approach has been endorsed by the Fourth Circuit which held that the language of 18 U.S.C.A. § 3592(c)(2) "authorizes and likely requires the court to look past the elements of the offense to the offense conduct." *United States v. Higgs*, 353 F.3d 281, 316 (4th Cir. 2003). Similarly, the Eighth Circuit "examine[d] the structure and language of the FDPA," and reached the same conclusion, holding that the "categorical approach" of looking only to the fact of conviction is inapplicable to capital sentencing as to § 3592(c)(4). *United States v. Rodriguez*, 581 F.3d 775, 806 (8th Cir. 2009). Both *Higgs* and *Rodriguez* informed the decision in *United States v. Basciano*, 763 F. Supp. 2d 303, 348 (E.D.N.Y. 2011), which similarly held that "an individualized determination will be appropriate" and that the

government would be able to put forward facts beyond a mere conviction. *Basciano* was later affirmed by the Second Circuit, albeit in a non-precedential decision. *United States v. Basciano*, 634 F. App'x 832 (2d Cir. 2015). Other courts have reached a similar conclusion. *See, e.g.*, *United States v. Sablan*, 555 F. Supp. 2d 1177, 1191 (D. Colo. 2006) (limiting the jury's consideration of prior convictions to merely the fact of the convictions is "nonsensical in light of the fact that a capital case differs from a normal criminal case because of the need for more individualized sentencing, requiring that the jury have before it all possible relevant information about the individual defendant whose fate it must determine") (citations omitted); *United States v. Chong*, 98 F. Supp. 2d 1110, 1120 (D. Haw. 1999) (noting that the Federal Death Penalty Act is a "weighing statute," and that the jury must be aware of the underlying circumstances of the prior convictions in order to properly weigh the information in aggravation and mitigation); *cf. United States v. Smith*, 630 F. Supp. 2d 713, 718 (E.D. La. 2007) (concluding "that the categorical approach is appropriate in dealing with prior convictions alleged as statutory aggravating factors").

I find that the reasoning in the above-cited authority is persuasive and applies equally to the three statutory factors set out in the amended notice premised on Mr. Con-ui's prior convictions. Because the Supreme Court has made it clear that an individualized determination is required in the death penalty context, *Zant*, 462 U.S. at 877–79, because "[t]he objective of the sentencing stage of a capital case is to allow the jury a full appraisal of the defendant," *United States v. Lujan*, 603 F.3d 850, 858 (10th Cir. 2010) (citation omitted), and because the jury should receive "as much information as possible when it makes the sentencing decision," *Gregg v. Georgia*, 428 U.S. 153, 203-04 (1976), I will allow the government to present to the jury relevant circumstances underlying Mr. Con-ui's prior convictions.

However, the mandate to particularize capital sentencing must be balanced against Mr. Con-ui's evidentiary protections. The trial court must "exercise its judgment and discretion to ensure that evidence is excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." *United*

22

*States v. Smith*, 2008 WL 3285911, at *9 (E.D. Va. Aug. 8, 2008). Thus, I will require the government to submit, prior to the commencement of the penalty phase, if any, a particularized proffer of all evidence the government intends to present to establish the aggravating factors related to convictions. *See United States v. Beckford*, 964 F.Supp. 993 (E.D. Va. 1997) (requiring a specific proffer from the government before the evidence is admitted, sufficient for the court to determine reliability before the evidence is presented to the jury); *see also United States v. Taylor*, 316 F. Supp. 2d 730, 742 (N.D. Ind. 2004) (requiring government proffer of information); *United States v. Edelin*, 134 F. Supp. 2d 59, 75 (D.D. Cir. 2001) (same). The proffer shall be filed under seal, and, following an *in camera* review, I will determine what evidence will be preliminary permitted, balancing its probative value against any unfair prejudice, assessing its level of particular relevance to the sentencing decision, and safeguarding against confusion of the issues. Notwithstanding, at trial, Mr. Con-ui may still voice his objections as to particular pieces of evidence, and I reserve my judgment as to those objections, especially when the issues involve the assessment of credibility of potential witnesses. However, following other courts, I will not issue an across-the-board ban on all evidence beyond the mere fact of conviction. Thus, Mr. Con-ui's motion will be denied.

Further, Mr. Con-ui's Supplemental Motion *in Limine* (Doc. 934) will be deferred at this time as it argues for the exclusion of particular evidence related to the statutory aggravating factors premised on Mr. Con-ui's prior convictions, and, as explained above, no decision will be made until the government submits the specific proffer of particularized evidence.

## V.     Mr. Con-ui's Motion *in Limine* to Bar Duplicative Use of Certain of the Aggravating Factors and Evidence. (Doc. 922, at 47).

Mr. Con-ui argues that certain aggravating factors in the government's notice of intent are alleged in a duplicative fashion, "serving 'double duty' in support of more than one aggravating factor." (*Id.* at 47-48). The danger, according to Mr. Con-ui, is that "the more aggravating factors a jury is presented with or ultimately finds, the more likely it is to return

23

a sentence of death, [and] [a]lthough juries are instructed to evaluate aggravating evidence qualitatively, there remains a danger in numerosity." (*Id.*).

Specifically, Mr. Con-ui argues that the first statutory aggravating factor, involving "an offense for which a sentence of death or life imprisonment was authorized," subsumes the second statutory aggravating factor, involving "a previous conviction for a violent felony involving a firearm," because both factors relate to the 2002 murder of Carlos Garcia, an offense to which Mr. Con-ui entered a guilty plea in 2008. Thus, Mr. Con-ui argues that the government should be ordered to elect between these two factors.

The government, however, argues that, although several aggravating factors rely on the same evidence or facts, each factor is alleged to highlight a different characteristic of the Mr. Con-ui. Moreover, even if some aggravating factors are duplicative, according to the government, it is not clear that duplicative factors are unconstitutional.

The circuit courts are split on this issue. The Fourth, Ninth, and Tenth Circuits have held that allowing the jury to consider duplicative aggravating factors is prohibited and would require a new penalty phase. *See United States v. Tipton*, 90 F.3d 861, 900 (4th Cir.1996); *Allen v. Woodford*, 395 F.3d 979, 1012-13 (9th Cir.2005); *United States v. McCullah*, 76 F.3d 1087, 1111-12 (10th Cir. 1996). On the other hand, the Eighth Circuit has held that the duplicative aggravating factor theory is inapplicable to the FDPA, *United States v. Purkey*, 428 F.3d 738, 762 (8th Cir. 2005), and the Fifth Circuit no longer endorses the theory. *United States v. Robinson*, 367 F.3d 278, 293 (5th Cir. 2004).[10]

The concept of duplicative factors that may result in impermissible "double-counting" or "double-weighing" first arose in *McCullah*, 76 F.3d at 1111-12, a case on which Mr. Con-ui relies. There, the Tenth Circuit held that duplicative aggravating factors "skew the weighing process and create the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally." *Id.* The court found substantial overlap between a non-statutory

---

[10] The Third Circuit has not yet addressed the constitutionality of allegedly duplicative aggravating factors.

aggravating factor, which alleged that the defendant acted with intent to kill, and the statutory factor of grave risk of death, and concluded that because "[a]ny intentional conduct aimed at producing death is by definition conduct done with knowledge of grave risk of death," the two factors were impermissibly duplicative. *Id.*

Three years after *McCullah*, the Supreme Court, in a plurality opinion, addressed the issue of when aggravating factors impermissibly "double-count" the same facts. Justice Thomas, joined by three other justices, stated that:

> [w]e have never before held that aggravating factors could be duplicative so as to render them constitutionally invalid, nor have we passed on the "double counting" theory that the Tenth Circuit advanced in *McCullah* and the Fifth Circuit appears to have followed here. What we have said is that the weighing process may be impermissibly skewed if the sentencing jury considers an invalid factor.

*Jones v. United States*, 527 U.S. 373, 398 (1999) (citations and footnotes omitted).

In light of *Jones*, the Fifth Circuit withdrew its support for the double-counting theory and pointed out that "[a]lthough our case law once [endorsed the theory], the Supreme Court recently admonished that it does not support that theory of review." *Robinson*, 367 F.3d at 292-93.

I find the guidance of the Supreme Court instructive, and I am persuaded by the reasoning of the Eighth Circuit in *Purkey*, 428 F.3d at 762, and the Fifth Circuit in *Robinson*, 367 F.3d at 292-93. I thus join other courts in finding that a capital jury may be permissibly presented with duplicative aggravating factors. *See, e.g., United States v. Merriweather,* 2014 WL 2890632, at *7 (N.D. Ala. June 25, 2014); *United States v. Coonce*, 2014 WL 1018081, at *6 (W.D. Mo. Mar. 14, 2014); *United States v. Williams,* 2013 WL 1335599, at *26 (M.D. Pa. Mar. 29, 2013); *cf. United States v. Llera Plaza*, 179 F. Supp. 2d 464, 489 (E.D. Pa. 2001).

Moreover, I do not view the aggravating factors at issue as duplicative. Aggravating factors are duplicative only when one "necessarily subsumes" the other, *McCullah*, 76 F.3d at 1111, or, more precisely, when a jury would "necessarily have to find one in order to find the other." *Johnson v. Gibson*, 169 F.3d 1239, 1252 (10th Cir.1999). Two factors are not

duplicative merely because they are supported by the same evidence. *See Jones*, 527 U.S. at 399, 119 S.Ct. 2090.

Here, Mr. Con-ui argues that the first statutory aggravating factor involving "an offense for which a sentence of death or life imprisonment was authorized," under § 3592(c)(3), and the second statutory aggravating factor involving "a previous conviction for a violent felony involving a firearm," under § 3592(c)(2), relate to the same crime - the 2002 murder of Carlos Garcia, an offense to which Mr. Con-ui entered a guilty plea. Thus, Mr. Con-ui argues, the government should be ordered to elect between those two factors. "Otherwise, the danger of double-counting is front and center in this case." (Doc. 922, at 49).

While those two aggravating factors overlap to a certain degree, no one factor necessarily subsumes another. As the Eight Circuit has held, "the same facts can support different inferences that form different aggravators." *Purkey*, 428 F.3d at 762 (quoting *Medlock v. Ward*, 200 F.3d 1314, 1319 (10th Cir.2000) (*per curiam*)). "Otherwise the government would either have to choose one out of several possible aggravating factors for each instance of a defendant's misconduct or pack into a single aggravator multiple negative inferences that could be drawn from the misconduct and then risk the jury's rejection of the aggravator due to disagreement over just one of the inferences." *Purkey*, 428 F.3d at 762. In *Williams*, 2013 WL 1335599, a case from this district, the court considered an identical challenge involving the same aggravators and held that "both of the aggravating factors are legitimate." *Id.* at *26. The court reasoned that,

> Congress determined, in Section 3592(c)(2), that a defendant is deserving of greater condemnation if he has previously been convicted of an offense involving the use of a firearm and, in Section 3592(c)(3), that greater condemnation is warranted if the defendant has previously been convicted of another offense resulting in the death of a person, for which a sentence of life imprisonment or a sentence of death was statutorily authorized.

*Id.* Indeed, § 3592(c)(3) focuses on the commission of a crime of the type that triggers the imposition of the harshest punishment in our criminal system, while § 3592(c)(2) focuses on the means of carrying out a type of a felony; stated differently, the former involves the

26

nature of the criminal act, while the latter focuses on the instrumentality of that crime. While both issues may present themselves in a single incident, it cannot be said that one necessarily subsumes the other. Thus, there is "no reason to question Congress's judgment" that those characteristics, highlighting a different aspect of the crime, "are deserving of enhanced punishment," *Williams*, 2013 WL 1335599, at *26, "and under *Jones* their use is none the worse in tandem." *Robinson*, 367 F.3d at 293. As such, the government will be permitted to allege, and attempt to prove beyond a reasonable doubt, both factors.

Finally, the Supreme Court has stated that a curative instruction might alleviate any potential unfairness in the statutory scheme, and that a court's instruction that factors should be weighed qualitatively rather than quantitatively eliminates any risk of skewing the weighing process. *Jones*, 527 U.S. at 399–400. Thus, following the decision in *Purkey*, 428 F.3d at 761–62, I will instruct the jury that the FDPA is a weighing statute and it "avoids arbitrary death sentences by requiring juries to weigh aggravating and mitigating factors rather than to tally the factors on each side and declare a winner based on sheer numbers." *Id.* (quoting 18 U.S.C. § 3593(e)); *see also United States v. Bolden*, 545 F.3d 609, 625 (8th Cir.2008) ("The district court properly instructed the jurors that in weighing the aggravating and mitigating factors, they were not simply to count each factor and reach a decision based on which number is greater; rather, they should individually consider the weight and value of each factor before deciding whether a sentence of death is justified."); *Purkey*, 428 F.3d at 762 ("The district court ensured that the jury would not employ a tally method of evaluating factors when it instructed the jury that weighing aggravating and mitigating factors ... is not a mechanical process. In other words, you should not simply count the number of aggravating and mitigating factors. The law contemplates that different factors may be given different weights or values by different jurors."). Moreover, I will instruct the jury that two or more aggravating factors might be supported by the same evidence and

stem from the same conviction.[11] *See United States v. Bradley*, 880 F. Supp. 271, 289 (M.D. Pa. 1994).

Thus, Mr. Con-ui's motion will be denied.

**VI.     Mr. Con-ui's Motion *in Limine* to Limit or Exclude Evidence Related to Mr. Con-ui's Alleged Participation in Additional Uncharged Acts of Serious Violence and Attempted Acts of Serious Violence. (Doc. 922, at 52).**

Mr. Con-ui asks the Court to exclude evidence of the non-statutory aggravating factor alleging that Mr. Con-ui participated in serious acts of violence and attempted violence. There are five acts specified in the government's notice of intent. They are as follows:

a)    In September-October 1999, the defendant agreed to participate in the stabbing of other inmates at ASPC Winslow;

b)    On June 2, 2000, the defendant assaulted another inmate with a metal food tray at ASPC Winslow;

c)    In May-June 2003, in Phoenix, Arizona, the defendant agreed to participate in multiple murders, including the murder of a law enforcement officer, but was arrested by police before the murders could be committed;

d)    On October 23, 2009, while an inmate at USP Victorville, the defendant threatened to physically harm a federal corrections officer;

e)    On November 21, 2010, the defendant, while an inmate at USP Pollock, assaulted and stabbed another inmate with a homemade weapon.

Doc. 884, at 4-5.

In its court-ordered Informational Outline (Doc. 883), the government further placed the defense on notice that it intends to present evidence of acts committed by Mr. Con-ui while he was incarcerated in the Arizona Department of Corrections, including: assaulting three inmates; urging another Arizona Mexican Mafia member in a letter to "soak the earth" with the blood of a rival prison gang; and possessing homemade weapons known as

---

[11] In passing, Mr. Con-ui also states that "the alleged plot to murder witnesses in 2002 is inextricably tied to the narcotics conspiracy that is the subject of the federal conviction. It is the same conspiracy." (Doc. 922, at 49). Mr. Con-ui is encouraged to propose a curative instruction to mitigate against any perceived issues involving double-counting or double-weighing.

"shanks." The Informational Outline also placed the defense on notice that the government intends to present evidence of acts committed by Mr. Con-ui during the time period between his release from the Arizona Department of corrections and his arrest on federal drug charges, including: his participation in multiple home invasions/robberies; his assignment by the Arizona Mexican Mafia to kill others; and his assault of his then-girlfriend. The government has also notified the defense that it intends to present evidence of Mr. Con-ui's threat to harm or kill a corrections officer at the United States Penitentiary, Administrative Maximum Facility in Fremont County, Colorado ("ADX") on July 6, 2016.

In the instant motion *in limine*, Mr. Con-ui argues that, first, the government's resort to these incidents presents a threat to the fairness of the trial. The danger, according to the defense, is that, although the government has foresworn any overt intention to prove that Mr. Con-ui presents a future danger, a jury, hearing about numerous acts of violence on Mr. Con-ui's part, will conclude that he is a violent person likely to pose a future danger to those around him. Second, Mr. Con-ui argues that many of the "uncharged acts of serious violence" do not involve any level of violence or attempted violence. As such, some of the proposed non-statutory factors are, according to Mr. Con-ui, void-for-vagueness and should be stricken. Third, Mr. Con-ui argues that many of the acts are too remote in time to be presented to the jury.

The government contends, however, that the above-mentioned incidents are serious crimes involving violence, or, in some cases, attempted, threatened or planned violence, and they all relate to Mr. Con-ui's character, making them relevant to the jury's decision at the selection phase.

As to Mr. Con-ui's first contention that the government's resort to these incidents presents "a serious threat to the fairness of the trial," (Doc. 922, at 53), courts have consistently held that the Constitution does not impose a *per se* bar on the use of unadjudicated criminal conduct in capital sentencing. *See United States v. Lujan*, 603 F.3d 850, 856 (10th Cir.2010) ("[T]he Supreme Court ... [has] repeatedly held that the district court may admit evidence of . . . unadjudicated conduct in the penalty phase of a capital trial

without violating the defendant's constitutional rights."). *See also United States v. Gabrion,* 648 F.3d 307, 348 (6th Cir.2011*), rev'd en banc on other grounds,* 719 F.3d 511 (6th Cir.2013*); United States v. Corley,* 519 F.3d 716, 724 (7th Cir.2008); *Brown v. Dretke,* 419 F.3d 365, 376–77 (5th Cir.2005); *Hatch v. State*, 58 F.3d 1447, 1465 (10th Cir.1995); *United States v. Davis*, 912 F. Supp. 938, 949 (E.D. La. 1996); *United States v. Beckford*, 964 F. Supp. 993, 1004 (E.D. Va. 1997) ("Jury consideration of non-statutory aggravating factors, as long as they relate to the character of the defendant and to the crime he committed, does not violate the Constitution . . . .") (citation omitted). "For the court to impose a *per se* ban on such evidence would give juries a far more positive view of many capital defendants than is true and accurate. This would detract from the reliability of capital sentencing, because the more information juries have about offenders, the more reliable and predictable their determinations will be." *United States v. Gilbert*, 120 F. Supp. 2d 147, 152 (D. Mass. 2000).

Although there is no standard procedure for dealing with the admission of non-statutory aggravating evidence, heightened reliability concerns in capital sentencing require a threshold determination that evidence of unadjudicated conduct is reliable prior to its admission. Moreover, although there are no constitutional limitations on the use of hearsay evidence at such proceedings, "a defendant may not be sentenced on the basis of misinformation of constitutional magnitude." *United States v. Wise*, 976 F.2d 393, 402 (8th Cir. 1992) (citing *United States v. Tucker*, 404 U.S. 443, 447, 92 S.Ct. 589, 592 (1972)). Thus, "sufficient indicia of reliability to support its probable accuracy" must accompany a hearsay statement. *United States v. Umana*, 750 F.3d 320, 348 (4th Cir. 2014) (citation omitted). Moreover, "a significant possibility of misinformation justifies the sentencing court in requiring the government to verify the [hearsay] information." *United States v. Fields*, 483 F.3d 313, 338 (5th Cir. 2007) (citation omitted). The proposed factors must also meet the constitutional requirements for validity to "ensure that the process is neutral and principled so as to guard against bias or caprice in the sentencing decision." *Tuilaepa v. California*, 512 U.S. 967, 973, 114 S. Ct. 2630, 2635, 129 L. Ed. 2d 750 (1994).

Finally, evidence of the unadjudicated conduct must also be more probative than unfairly prejudicial. *See* 18 U.S.C. § 3593(c) (authorizing the judge to exclude evidence if "its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury").There are also legitimate issues involving the extent of the proof that the government will be permitted to offer at trial to prove each criminal act beyond a reasonable doubt. *See United States v. Cooper*, 91 F.Supp.2d 90, 108 (D.D.C. 2000).

In sum, the introduction of non-statutory aggravators is not an evidentiary free-for-all. Although admission of non-statutory aggravating evidence is conducted at the discretion of the judge without any statutory guidance, basic considerations of fairness and Due Process, promoting the integrity of the trial, must nevertheless be respected. Similarly, with respect to the Sentencing Guidelines, courts have stated that

> if . . . the prosecutor believe[s] that the circumstances of the offense, the defendant's role in the offense, or other pertinent aggravating circumstances, merit a lengthier sentence [or, in the instant case, the death penalty], they must be prepared to establish that pertinent information by evidence adequate to satisfy the judicial skepticism aroused by the lengthier sentence that the proffered information would require the district court to impose. What evidence will be deemed sufficiently reliable to satisfy this burden is for the district courts to determine, exercising the same fact-finding faculties they are daily called upon to utilize in a myriad of situations.[12]

*United States v. Wise*, 976 F.2d 393, 403 (8th Cir. 1992).

I am keenly aware that my determinations as to the admissibility of non-statutory aggravating evidence must carefully balance "the requisite access to a wide range of information to achieve individualized sentences and . . . the need to protect defendants from being sentenced on the basis of misinformation of a constitutional magnitude." *United States v. Fields*, 483 F.3d 313, 338 (5th Cir. 2007). *See also Zant v. Stephens*, 462 U.S. 862, 879, 103 S. Ct. 2733, 2743–44 (1983) ("What is important at the selection stage is an individualized determination on the basis of the character of the individual and the

---

[12] In the context of capital trials, the additional safeguard is that a jury must consider whether the non-statutory aggravating factors alleged by the government have been proven to the jury's unanimous satisfaction beyond a reasonable doubt.

circumstances of the crime.") However, I will not "freez[e] the evidential procedure of sentencing in the mold of trial procedure," where the challenged evidence is relevant to a jury's sentence selection decision. *Williams*, 337 U.S. at 251.

**A.      The Assessment of Individual Acts**

The evaluation and admission of non-statutory aggravating evidence is fact-intensive and, thus, I will address each individual incident in turn.

**1.      "The defendant's involvement in a plan to attack other inmates at ASPC Winslow in September-October 1999." (Doc. 883, at ¶ 14)**.

The government intends to present evidence that Mr. Con-ui, while an inmate at the Arizona State Prison Complex ("ASPC") in Winslow 1999, was involved in a plan to stab four other inmates on September 5, 1999. The plan was foiled when prison staff received information detailing the plan from an anonymous prison source. A disciplinary hearing report specified that Mr. Con-ui later plead guilty to "threats against another inmate." (USAO-016503).

The government intends to present the testimony of the correctional officer who investigated the plot, the testimony of the hearing officer who accepted Mr. Con-ui's guilty plea to the disciplinary violation, and various prison documentation related to the investigation and disposition of the incident.

I note first that the events at issue took place nearly eighteen years ago. Thus, given the significant passage of time, I am concerned about the reliability of the proposed testimony of the officers who investigated the plot and accepted Mr. Con-ui's guilty plea.

On the other hand, there is sufficient corroboration of the allegations by other means. First, the anonymous letter received by prison officials was subsequently corroborated not only by another confidential informant "who has given reliable information in the past," but also by "CIU R. Brouder" who "had received information about the same type/kind of hit." Second, by virtue of Mr. Con-ui's admission of guilt to charges arising out the alleged scheme to stab four inmates, and by placing his signature on the Inmate Disciplinary Report (USAO-016503), Mr. Con-ui rendered these allegations more reliable. Moreover, the reports

contain sufficient detail, such as the specific names of the alleged perpetrators and victims, dates, and motives for the alleged attack, further shoring up their reliability. There is no reason to believe that the law enforcement officers involved in the investigation, which corroborated two unnamed sources, had any reason or motive to distort or misrepresent facts.

Thus, the allegation will not the stricken. However, I am not inclined to allow a jury to consider imposing a sentence of death by relying on testimony about events that occurred nearly two decades ago. As such, testimony of the officers who helped investigate the plot and who accepted Mr. Con-ui's guilty plea will not be allowed. Moreover, I will order that the government provide the defense with an unredacted version of the documents pertaining to this incident.[13]

**2.**     **"The defendant's assault of another inmate with a metal food tray on June 2, 2000, at ASPC Winslow**." **(Doc. 883, at ¶ 20).**

The government intends to present evidence that on June 2, 2000, at ASPC Winslow, Mr. Con-ui assaulted another inmate using a metal food tray. Specifically, the government intends to present the testimony of Arizona Corrections Officer Lt. David Morales.

Lt. Morales, however, did not personally witness the assault. Instead, he later viewed a video of the assault, which "has since been destroyed" (USAO-16813), from which he identified Mr. Con-ui as the individual who struck another inmate with a metal food tray. The unreliability of Lt. Morales' account is evident from the interview he gave in 2013, thirteen years after the incident, where he stated that he "believes" the injured inmate "may have been taken out of the prison for medical treatment" (USAO-016814), and speculates that Mr. Con-ui "may have assaulted the inmate to become a member of the [Arizona Mexican Mafia]." *Id*. Although Lt. Morales described the assault as "pretty vicious" in his 2013

---

[13] Thus, I hereby amend my January 20, 2017 Order, which kept government documents USAO-016504 and USAO-016506 redacted. They shall now be provided to Mr. Con-ui under a protective order in an unredacted form.

interview, there is nothing to corroborate that description, given the absence of the videotape or any medical records indicating the extent of the injuries Mr. Con-ui allegedly inflicted. As such, the testimony of Lt. Morales will be precluded.

However, because the government also states that Mr. Con-ui later pleaded guilty to the disciplinary violation of "assaulting another person with a weapon," the government will be permitted to present any prison documents related to the investigation and disposition of this incident. Again, I will order that the government provide the defense with an unredacted version of the documents pertaining to this incident.

3.   **"The defendant agreed to participate in the murder of others, including a law enforcement officer in May-June 2003 in Phoenix, Arizona." (Doc. 883, at ¶ 26).**

During an investigation into drug trafficking by members of the Arizona Mexican Mafia — the same investigation that resulted in Mr. Con-ui's prosecution for and guilty plea to the federal drug conspiracy charge — the Federal Bureau of Investigation and Phoenix Police allegedly uncovered evidence of a plan to commit multiple murders, including the murder of a law enforcement officer. This evidence includes testimony by cooperating witnesses and recordings of meetings where Arizona Mexican Mafia members, including Mr. Con-ui, decided on the plan. Mr. Con-ui as well as other members of the alleged conspiracy were arrested before they could carry out the planned murders.

I note at the outset that I am unable to assess the reliability of the evidence at this time. The defense has provided the Court with hours of video footage gathered in the spring of 2003 as part of the federal narcotics conspiracy to which Mr. Con-ui ultimately plead guilty. No transcripts of relevant conversations have been provided and the tapes themselves vary in quality as to audibility and the ability to reliably identify the speakers. It also does not appear than any overt acts were taken to achieve the object of the discussions. If the recorded conversations indeed capture Mr. Con-ui's agreement to commit multiple murders, Mr. Con-ui's self-incriminatory statements would, of course, constitute highly probative and reliable evidence.

Thus, I will require the government to submit, prior to the commencement of the penalty phase, if any, a particularized proffer of all evidence the government intends to present to establish this incident. The proffer shall be filed under seal, and, following an *in camera* review, I will determine what evidence will be preliminary permitted, balancing its probative value against any unfair prejudice, assessing its level of reliability and relevance to the sentencing decision, and safeguarding against confusion of the issues. Notwithstanding, at trial, Mr. Con-ui may still voice his objections as to particular pieces of evidence, and I reserve my judgment as to those objections, especially when the issues involve the assessment of credibility of potential witnesses.

### 4. "The defendant's threat to harm a federal corrections officer on October 23, 2009 at USP Victorville." (Doc. 883, at ¶ 31).

The government intends to present evidence related to a threat that Mr. Con-ui allegedly made on October 23, 2009 to a corrections officer after that officer searched Mr. Con-ui's cell and removed items therefrom. The officer, James Cobos, is prepared to testify that, after the search, Mr. Con-ui followed him and said, "You need to watch who you are fucking with, before you get hurt."

Mr. Con-ui denied making the threat when he appeared before a Disciplinary Hearing Officer after being written up for "Threatening another with bodily harm [and] insolence towards a staff member." Mr. Con-ui explained that, "I called him a piece of shit, but I didn't say what was in the report." (*Id*.) Later, the reports indicates that Mr. Con-ui said, "I didn't threaten him, I just told him he was a piece of shit and he needs to be careful who he fucks with." (USAO-001105).

Officer Cobos is also prepared to testify that, in his opinion, Mr. Con-ui meant the threat, and that because of the alleged threat, he never searched Mr. Con-ui's cell again. (USAO 0168818-0016820).

Mr. Con-ui was subsequently found guilty of the prison disciplinary violation of "threatening another with bodily harm." Thus, as with the preceding incidents, the government will be permitted to present any documents related to the investigation and

disposition of this incident. Again, I will order that the government provide the defense with an unredacted version of the documents pertaining to this incident.

Moreover, Because Mr. Con-ui denies these allegations, assessment of Officer Cobos' credibility by the jury is crucial. As such, he will be permitted to testify. However, because Officer Cobos cannot testify to the operation of Mr. Con-ui's mind, he will not be allowed to express his opinion as to whether Mr. Con-ui "meant the threat."

5.    **"The defendant's assault with a weapon on another inmate on November 21, 2010, at USP Pollock**." (Doc. 883, at ¶ 34).

The government intends to present evidence that on November 21, 2010, at USP Pollock, Mr. Con-ui stabbed another inmate using a prison-made shank. The government intends to present a video of the incident, testimony of several eyewitnesses to the assault, reports of disciplinary proceedings, and reports (including photographs) related to the weapon used by Mr. Con-ui and the injuries suffered by the victim.

I have reviewed the video independently and find that it ought to be admitted, and I incorporate here my reasoning for the admission of the video of the offense charge here. The government will also be permitted to present any prison documents related to the investigation and disposition of this incident. Again, I will order that the government provide the defense with an unredacted version of the prison documents pertaining to this incident.

However, testimony of any eyewitnesses, to the extent that they testify to the content of the video or narrate or corroborate the events visible in the video, will be precluded. I will also allow one photograph of the weapon used in the attack, and one photograph of the injuries suffered by the victim.

6.    **Mr. Con-ui's threat to harm a corrections officer at ADX on July 6, 2016.** *See* Doc. 922, at 53, 67-69.

The government intends to present evidence of an incident allegedly involving a threat to harm a corrections officer. On July 6, 2016, while an inmate at ADX, Mr. Con-ui told several officers that he did not like a particular officer and wanted to prevent him from entering his cell's inner vestibule. Mr. Con-ui then stated that he "did not want to do it again"

but that he would in order "to protect himself." (USAO-017348). He further alluded to the murder of Officer Williams, stating allegedly that "'I did not just pick a random person, the guy was young and messing with me." (*Id.*) He also stated, according to a report, that the ADX officer was "like the other and doesn't know how to talk to inmates." He went on to describe the inner vestibule of his cell as a "'kill box,'" and observed, "What can they do? Kill me twice?"

I find that the probative value of the evidence is outweighed by the danger of unfair prejudice and confusion of the issues. The danger that the jury will consider this evidence for an improper and irrelevant purpose is significant. The presentation of this incident, and, in particular, the statements attributed to Mr. Con-ui, is fraught with the risk that the jury will improperly consider it as evidence of the non-statutory aggravating factor of future dangerousness (including a lack of remorse and low rehabilitative potential). This evidence injects into sentencing the prejudice of the noted improper consideration by the jury that outweighs the proposed evidence's otherwise probative value.

Thus, this allegation will be stricken.

### 7.    The Remaining Incidents Alleged in the Informational Outline. (Doc. 883, at ¶¶ 24, 25).

In its Informational Outline, the government notified Mr. Con-ui that it also intended to present evidence related to Mr. Con-ui's alleged criminal activity while an inmate at the Arizona Department of Corrections ("DOC") and during the time period between Mr. Con-ui's release from state prison and his subsequent arrest on federal drug charges.

The criminal conduct at the Arizona DOC allegedly includes: collecting taxes on illegal drugs smuggled into the prison; assaulting three inmates on separate occasions; possessing weapons; and sending a letter urging a fellow gang member to "soak the earth" with the blood of a rival prison gang. The criminal conduct that Mr. Con-ui allegedly engaged in after his release from state prison and before his federal arrest includes: multiple home invasions/robberies during which victims were assaulted, restrained, and threatened with harm; Mr. Con-ui's assignment to commit murders for the Arizona Mexican Mafia; and Mr.

Con-ui's assault on his then-girlfriend.

However, the government provides little additional detail about these incidents, such as specific dates and supporting evidence. Thus, I am not able to properly assess and consider these acts. As such, I will require the government to submit, prior to the commencement of the penalty phase, if any, a particularized proffer of all evidence the government intends to present to establish the above-listed incidents. The proffer shall be filed under seal, and, following an *in camera* review, I will determine what evidence will be preliminary permitted, balancing its probative value against any unfair prejudice, assessing its level of reliability and relevance to the sentencing decision, and safeguarding against confusion of the issues. Notwithstanding, at trial, Mr. Con-ui may still voice his objections as to particular pieces of evidence, and I reserve my judgment as to those objections, especially when the issues involve the assessment of credibility of potential witnesses.

## B.    Mr. Con-ui's Remaining Objection

Mr. Con-ui contends that the above-mentioned incidents, even if true, do not support the aggravating factor of "Participation in Uncharged Serious Acts of Violence." According to Mr. Con-ui, many of the incidents do not involve any level of violence, or even attempted violence.

First, I disagree with both Mr. Con-ui and the government that "violence" ought to be the dispositive characteristic governing the admissibility of past behavior. Rather, the "criminality" of those acts should govern. *United States v. Gilbert* is instructive here:

> [o]n the question of what crimes are . . . relevant, the court is guided by the statutory aggravating factors Congress has listed in 18 U.S.C. § 3592, which provide "a ready framework for determining Congressional intent" on this matter. [*United States v. Davis,* 912 F. Supp. 938, 944 (E.D. La. 1996)]. The statutory aggravating factors list only very serious or repetitive felony offenses, such as child molestation, previous conviction of a capital crime, or prior conviction of a felony involving a firearm. *See* 18 U.S.C. § 3592(c). From these factors, it is clear that to be a relevant aggravating factor in favor of the death penalty, prior misconduct must at least be a crime, and a grave one at that. *See United States v. Friend*, 92 F.Supp.2d 534, 544 (E.D.Va.2000). Consideration of relatively minor misbehavior, however disturbing, would undermine the seriousness of the death penalty decision. Rather than helping the jury's decision, the previous misconduct would be a

"pernicious distraction[ ] ... in considering whether a defendant shall live or die." *United States v. Peoples*, 74 F.Supp.2d 930, 932 (W.D.Mo.1999).

120 F. Supp. 2d 147, 152–53 (D. Mass. 2000).

Part of the dispute may be mere quibbling over semantics. The government, in its notice of intent, refers to the acts at issue as "uncharged serious acts of violence." (Doc. 884, at 4). The government also refers to "attempted violence." *Id*. I agree with Mr. Con-ui that it might be difficult to craft an instruction that adequately explains to a jury how to distinguish an act of violence from a *serious* act of violence. Both parties agree, at minimum, that "[t]o be a relevant aggravating factor, the prior misconduct must be a crime, and a grave one at that." *United States v. Diaz*, 2007 WL 656831 *19 (N. D. Cal. 2007); *see also United States v. Gilbert*, 120 F. Supp.2d 147, 153 (D. Mass. 2000); *United States v. Friend*, 92 F. Supp.2d 534, 544 (E.D. Va. 2000).

A review of death penalty cases reveals that this non-statutory aggravating factor is often labeled merely as one alleging "uncharged criminal conduct," or "uncharged acts of violence" (without the adjective "serious"). *United States v. Umana*, 707 F. Supp. 2d 621, 631 (W.D.N.C. 2010). *See also United States v. Higgs*, 353 F.3d 281, 323 (4th Cir.2003) ("unadjudicated crimes"); *United States v. Cisneros*, 363 F.Supp.2d 827, 838–39 (E.D.Va.2005) ("unadjudicated conduct" and "pattern of criminal activity"); *United States v. Beckford*, 964 F.Supp. 993, 998 (E.D.Va.1997) ("unadjudicated criminal acts"). The Supreme Court avoided the use of the term "violent" altogether when it stated that "[s]entencing courts have not only taken into consideration a defendant's prior conviction, but have also considered a defendant's *past criminal behavior*, even if no conviction resulted from that behavior." *Nichols v. United States*, 511 U.S. 738, 747, 114 S.Ct. 1921 (1994) (emphasis added).

I do not find that the proposed non-statutory factor is void-for-vagueness, and, therefore, I find that it should not be stricken on that basis. An aggravating factor "is not unconstitutional if it has some 'common-sense core of meaning ... that criminal juries should be capable of understanding.'" *Tuilaepa v. California*, 512 U.S. 967, 973, 114 S.Ct. 2630,

39

2636 (1994) (citation omitted). Moreover, vagueness is evaluated not only in light of the words used to define the aggravator, but also based on the construction given that factor by the courts. *See Proffitt v. Florida*, 428 U.S. 242, 255, 96 S. Ct. 2960, 2968 (1976); *Jones v. United States*, 527 U.S. 373, 400, 119 S. Ct. 2090, 2108 (1999) (stating that the government's argument to the jury in its closing statements cured the non-statutory factors of any infirmity as written). Therefore, the government will have the opportunity to craft its argument to the jury as well as to propose jury instructions that adequately characterize the instant non-statutory aggravating factor and the individual incidents that constitute it.

**VII.   Mr. Con-ui's Request for a Reliability Hearing. (Doc. 922, at 20).**

Mr. Con-ui argues that the penalty-phase evidence the government intends to present should be subject to a hearing to ensure that it meets the heightened standards of reliability and particular relevance for capital cases. Mr. Con-ui warns that "if the government is permitted to proceed as it currently proposes in its informational outline, this court will wind up presiding over numerous trials-within-a-trial of events that sometimes go back a decade and more." (*Id.* at 21).

According to Mr. Con-ui, this Court should "follow the *well-established practice* of convening a hearing to review challenged aspects of the government's penalty-phase evidence." (*Id.* at 25) (emphasis added). However, Mr. Con-ui's characterization of the prevalence of such hearings in capital cases is somewhat overstated. Mr. Con-ui cites to only one case where such a hearing was held, *United States v. O'Driscoll*, 250 F.Supp.2d 432 (M.D. Pa. 2002), and one case where such a hearing was contemplated, *United States v. Williams*, 2013 U.S. Dist. LEXIS 45323 (M.D. Pa. 2013). Research, however, reveals that most courts in capital cases do not conduct such hearings. *Compare United States v. Solomon*, 513 F. Supp. 2d 520, 539 (W.D. Pa. 2007); *United States v. LeCroy*, 441 F.3d 914, 929 (11th Cir. 2006); *United States v. Gooch*, 2006 WL 3780781, at *21 (D.D. Cir. 2006); *United States v. Mayhew*, 380 F. Supp. 2d 936, 947-48 (S.D. Ohio 2005); *United States v. Foster*, 2004 WL 903921, at *1 (D. Md. Apr.9, 2004); *United States v. Williams*, 2004 WL 2980027, at *17 (S.D.N.Y. Dec. 22, 2004), *aff'd,* 506 F.3d 151 (2d Cir. 2007);

*United States v. Taylor*, 316 F. Supp. 2d 730, 742 (N.D. Ind. 2004); *United States v. Edelin*, 134 F. Supp. 2d 59, 75-76 (D.D. Cir. 2001); *United States v. Llera Plaza*, 179 F. Supp. 2d 464, 468 (E.D. Pa. 2001); *United States v. Gilbert*, 120 F.Supp.2d 147, 153-54 (D. Mass. 2000); *United States v. Battle*, 173 F.3d 1343, 1347 (11th Cir.1999); *United States v. Glover*, 43 F.Supp.2d 1217, 1227-28 (D. Kan. 1999); *United States v. Frank*, 8 F.Supp.2d 253, 278–79 (S.D.N.Y. 1998); *United States v. Beckford*, 964 F. Supp. 993, 1000 (E.D. Va. 1997) *with United States v. Davis*, 912 F.Supp. 938, 949 (E.D. La.1996) (ordering a pretrial hearing on the admissibility of the information the government intends to introduce in support of the nonstatutory aggravating factors); *United States v. Corley*, 348 F.Supp.2d 970, 972 (N.D. Ind. 2004) (same); *United States v. Cooper*, 91 F.Supp.2d 90, 107 (D.D. Cir. 2000) (same).

Moreover, the statute requiring the government to provide notice of its intent to seek the death penalty does not require additional notice of evidentiary detail. *See* 18 U.S.C. § 3593(a). The statute reads:

> (a) Notice by the Government.—If, in a case involving an offense described in section 3591, the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified under this chapter, the attorney shall, a reasonable time before the trial or before acceptance by the court of a plea of guilty, sign and file with the court, and serve on the defendant, a notice—
>> (1) stating that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified under this chapter and that the government will seek the sentence of death; and
>> (2) setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death.
>>> The factors for which notice is provided under this subsection may include factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information. The court may permit the attorney for the government to amend the notice upon a showing of good cause.

18 U.S.C. § 3593. Thus, under the plain language of the statute, the government has more

than discharged its obligation to provide adequate notice of all aggravating factors by virtue of the indictment (Doc. 1), notice of intent (Doc. 884), and the informational outline (Doc. 883). As such, Mr. Con-ui is not entitled to an advance screening of the government's case. *See Gray v. Netherland*, 518 U.S. 152, 167–68, 116 S.Ct. 2074 (1996) (noting that there is no constitutional right to advance notice of the government's evidence in aggravation at a capital sentencing hearing); *United States v. Higgs*, 353 F.3d 281, 321 (4th Cir. 2003) ("[T]he FDPA and the Constitution require that the defendant receive adequate notice of the aggravating factor, . . . not notice of the specific evidence that will be used to support it.").

However, following the procedures utilized by other courts in death penalty cases, and in recognition of the need to ensure that all evidence is sufficiently reliable before it is presented to the jury, I may require specific proffer from government taken outside the hearing of the jury to establish reliability. *See Beckford*, 964 F.Supp. at 993-1000; *Foster*, 2004 WL 903921, at *1; *Gilbert*, 120 F.Supp.2d at 153-54. At that time, I would also ensure that the probative value of the proffered evidence is not outweighed by "the danger of creating unfair prejudice, confusing the issues, or misleading the jury," as required by 18 U.S.C. § 3593(c).

I am aware of the constitutionally-required standards applicable in the penalty phase of a death penalty trial, and I will discharge my duties by thoroughly assessing the relevance and reliability of the evidence as well as its prejudicial and probative impact. For some pieces of evidence, such as the video, the autopsy photographs, and certain testimony, I have already done so in this Opinion; for others, I will do so at trial.

Mr. Con-ui's request for a reliability hearing will be denied.

VIII.   **Mr. Con-ui's Motion *in Limine* to Exclude From All Phases of the Penalty Case Evidence That Does Not Meet the Standards of *Crawford v. Washington*, 541 U.S. 36 (2004). (Doc. 922, at 25).**

Before I assess Mr. Con-ui's arguments regarding the applicability of *Crawford v. Washington*, 541 U.S. 36 (2004) at the penalty phase, some background on the mechanics of capital trials might be instructive.

42

### A.     Federal Death Penalty Trials

Federal death penalty trials consist of two distinct phases: the guilt stage and the penalty stage (also called a sentencing hearing). The penalty phase commences only if a defendant is convicted of a qualifying offense for which a sentence of death is provided, *see* 18 U.S.C. § 3593(b), and consists of two distinct stages. The first, called the eligibility phase, narrows the pool of defendants eligible for the death penalty. A defendant becomes eligible for the death penalty only if the jury finds unanimously and beyond a reasonable doubt that: 1) the defendant was eighteen (18) years of age or older at the time of the offense, as required by § 3591(a); 2) the defendant acted with at least one of the statutorily-required mental states;[14] and 3) at least one of sixteen statutory aggravating factors enumerated in § 3592(c) exists. *See Jones v. United States*, 527 U.S. 373, 376-77, 119 S.Ct. 2090 (1999). *See also Zant v. Stephens,* 462 U.S. 862, 878, 103 S. Ct. 2733, 2743 (1983) ("[S]tatutory aggravating circumstances play a constitutionally necessary function ...: they circumscribe the class of persons eligible for the death penalty.").

If the jury makes the threshold eligibility findings, the penalty phase proceeds to the second stage, called the selection phase. During this phase, the jury decides the appropriate sentence by determining the existence of any additional statutory or

---

[14] Under 18 U.S.C. § 3591(a)(2), the government must prove that the defendant, with one of the following mental states,
> (A) intentionally killed the victim;
> (B) intentionally inflicted serious bodily injury that resulted in the death of the victim;
> (C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or
> (D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act[.]
18 U.S.C. § 3591(a)(2).

non-statutory aggravating factors submitted to it for consideration, as well as any mitigating factors under § 3592(a). The jury then "consider[s] whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death" and decides whether a defendant should be sentenced to death, to life imprisonment without possibility of release, or some other lesser sentence. § 3593(d), (e).

### B.    The Applicability of the Confrontation Clause at the Penalty Phase

In *Crawford v. Washington,* 541 U.S. 36 (2004), the Supreme Court altered its earlier interpretation of the Sixth Amendment's Confrontation Clause and barred the admission of "testimonial" out-of-court statements in criminal trials unless the declarant is unavailable and the defendant has had an opportunity to cross-examine the declarant.

Since the decision in *Crawford v. Washington*, lower courts have wrestled with the application of the Confrontation Clause to the penalty phase of a capital trial. Some district courts have held that the Clause applies throughout the entirety of the penalty phase, and thus, bars the government from introducing testimonial hearsay. *See, e.g., United States v. Pleau*, 2013 WL 1673109, at *4, *6 (D.R.I. Apr. 17, 2013); *United States v. Sablan*, 2008 WL 700172, at *1, *2 (D. Colo. Mar. 13, 2008); *United States v. Mills*, 446 F. Supp. 2d 1115, 1135-1139 (C.D. Cal. 2006).

However, every appellate court to consider this issue has taken a more limited view of the Clause's applicability at the penalty phase. *See United States v. Umana*, 750 F.3d 320 (4th Cir. 2014); *Muhammad v. Sec'y, Fla. Dep't of Corrections*, 733 F.3d 1065, 1073–77 (11th Cir. 2013); *United States v. Fields*, 483 F.3d 313, 324-326 (5th Cir. 2007);[15] *see also United States v. Barrett*, 496 F.3d 1079, 1100 (10th Cir. 2007) (stating, in passing, that "[i]t is far from clear that the Confrontation Clause applies to a capital sentencing proceeding").

---

[15] The Fifth Circuit did, however, caution that "due process requires that some minimal indicia of reliability accompany a hearsay statement, and a significant possibility of misinformation justifies the sentencing court in requiring the Government to verify the hearsay information." 483 F.3d at 337-338 (citations omitted).

Mr. Con-ui argues that "the rule easiest to apply, and most plainly grounded in Sixth and Eighth Amendment jurisprudence, is that the Confrontation Clause and therefore *Crawford* should apply to the entire penalty trial." (Doc. 922, at 32). However, I see no reason to depart from the well-considered decisions by the Fourth, Fifth, and Eleventh Circuits, especially given that no appellate court has endorsed Mr. Con-ui's reasoning.

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. However, courts have long held that the right to confrontation does not apply at sentencing. *See Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079 (1949); *Umana*, 750 F.3d at 346; *United States v. Wallace*, 408 F.3d 1046, 1048 (8th Cir.2005). *See also United States v. Petty*, 982 F.2d 1365, 1367 (9th Cir.1993); *United States v. Tardiff*, 969 F.2d 1283, 1287 (1st Cir.1992); *United States v. Silverman*, 976 F.2d 1502, 1510 (6th Cir.1992) (*en banc*); *United States v. Wise*, 976 F.2d 393, 402 (8th Cir.1992) (*en banc*); *United States v. Johnson*, 935 F.2d 47, 50 (4th Cir.1991); *United States v. Beaulieu*, 893 F.2d 1177, 1180-81 (10th Cir.1990); *United States v. Marshall*, 910 F.2d 1241, 1244 (5th Cir.1990); *United States v. Kikumura*, 918 F.2d 1084, 1102 (3d Cir.1990).

Although Mr. Con-ui attacks this conclusion by arguing that intervening law has eroded the Supreme Court's decision in *Williams*, which explained that "[t]he possession of the fullest information possible concerning the defendant's life characteristics" is vitally essential to the selection of a proper sentence, 337 U.S. at 247, the case remains good law. *See Alleyne v. United States*, 133 S. Ct. 2151, 2170, 186 L. Ed. 2d 314 (2013). Indeed, "a sentencing court [may] consider 'any relevant information before it, including uncorroborated hearsay, provided that the information has sufficient indicia of reliability to support its accuracy.'" *United States v. Powell*, 650 F.3d 392 (4th Cir.2011) (citation omitted). *Powell* held specifically that "[r]ecent Confrontation Clause decisions do not require us to reconsider this settled distinction between trial evidence and sentencing evidence in the hearsay context." *Id.* 392.

As the Supreme Court in *Williams* explained, historically, "both before and since the

American colonies became a nation . . . a sentencing judge could exercise wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law." 337 U.S. 241. Little changed over time as "[m]odern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial." *Id.* at 247. Nearly thirty years later, the Supreme Court in *Gregg v. Georgia*, 428 U.S. 153, 204, 96 S.Ct. 2909 (1976) affirmed that it is "desirable for the jury to have as much information before it as possible when it makes the sentencing decision."

Indeed, as the Fourth Circuit has observed, in contrast to determinations of guilt or innocence when the factfinder is constitutionally required to be "'hedged in by strict evidentiary procedural limitations,'" the Supreme Court explained that "the sentencing judge should be able to consider 'the fullest information possible concerning the defendant's life and characteristics'" - information that "would become 'unavailable'" if sentencing evidence were "restricted to that given in open court by witnesses subject to cross-examination." *Umana*, 750 F.3d at 346 (quoting *Williams*, 337 U.S. at 246, 250-51). Moreover, "[a] policy of full information during sentencing, unrestricted by the strict rules of evidence, enhances reliability by providing the sentencing jury with more relevant evidence." *Id*. As the court concluded, "the rigorous requirements of confrontation would not only be a setback for reliable sentencing, it could also 'endlessly delay criminal administration in a retrial of collateral issues.'" *Id.* at 347 (citation omitted).

The Supreme Court's decision in *Crawford* does not alter *Williams'* pronouncements, because *Crawford* was premised on the context of a trial for guilt. There, the Court held that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." 541 U.S. at 50. Evidence at a penalty phase is not evidence *against* the accused, but rather, in favor or against a particular sentence. Any findings made during sentencing do not mandate a finding of guilt or innocence, but rather go the determination

46

of penalty once guilt has been established beyond a reasonable doubt.

Indeed, admitting more evidence at the penalty stage, even if hearsay, is nothing more than an "age-old practice of seeking information from out-of-court sources to guide their judgment toward a more enlightened and just sentence." *Williams,* 337 U.S. at 250-51. This principle was later reaffirmed in *Nichols v. United States*, 511 U.S. 738, 747 (1994), which held that "[a]s a general proposition, a sentencing judge 'may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." (quoting *United States v. Tucker*, 404 U.S. 443, 446 (1972)).

Because neither the Supreme Court nor any Court of Appeals has held otherwise, I join other courts in finding that, while the right to confrontation is applicable in the guilt phase of a criminal trial, it does not apply to the entire penalty stage. *See Umana,* 750 F.3d 346*; Muhammad,* 733 F.3d at 1073–77; *Fields,* 483 F.3d at 324-326.

There is some disagreement among courts as to the extent of the Confrontation Clause's inapplicability at the penalty stage. Recently, several appellate courts have held that the Confrontation Clause does not apply at the *selection* phase of a capital sentencing proceeding, while leaving open the possibility that it might apply at the *eligibility* phase. *See Fields*, 483 F.3d at 338 (holding that "the principles underlying *Williams* are relevant, persuasive, and ultimately fatal to [the defendant's] Confrontation Clause challenge" to evidence introduced during the selection phase of capital sentencing). See *also Umana*, 750 F.3d at 348.

Only one appellate court has held that the Confrontation Clause does not apply to either the eligibility or sentencing phase. *Szabo v. Walls*, 313 F.3d 392 (7th Cir. 2002) (a pre-*Crawford* decision). In *Szabo*, the Seventh Circuit rejected on collateral review a claim that the Confrontation Clause applied at capital sentencing. Relying on *Williams*, the court determined that the Confrontation Clause "applies through the finding of guilt, but not to sentencing, even when that sentence is the death penalty." *Id.* at 398.

I disagree, however, with the complete exclusion of the Confrontation Clause at the

entirety of the penalty stage, and hold that the Clause is fully operative at the eligibility phase. *See, e.g., United States v. Jordan,* 357 F.Supp.2d 889, 903 (E. D. Va. 2005).

A jury's role during the selection phase differs from its role during the eligibility stage. As the Fourth Circuit has explained, under the FDPA, "the jury finds the facts necessary to support the imposition of the death penalty in the guilt and eligibility phases of the trial." *Umana,* 750 F.3d at 348-49 (emphasis omitted). In contrast, "[d]uring the selection phase, a jury is not legally required to find any facts." *Id.* at 349. "[W]hile it may do so," the court explained, "such facts are neither necessary nor sufficient to impose the death penalty - they merely guide the jury's discretion in choosing a penalty." *Id.* It is only during the guilt and eligibility phases of a trial "that the jury makes 'constitutionally significant' factual findings." *Id. at* 347-48. This is because any fact that increases the maximum penalty should be treated as an element of an aggravated offense, *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348 (2000), and "those intent and aggravating factors which the government intends to rely upon to render a defendant death-eligible under the FDPA are the functional equivalent of elements of the capital offense." *United States v. Higgs*, 353 F.3d 281, 298 (4th Cir. 2003). Indeed, the selection phase cannot alter the range of sentences a jury can impose on a defendant; rather, the jury is tasked only with selecting a sentence out of the alternatives for which a defendant has already been found eligible. *See United States v. Johnson*, 378 F. Supp. 2d 1051, 1061 (N.D. Iowa 2005) ("From a constitutional perspective, the eligibility phase is the most critical because it is a necessary prerequisite to the jury's consideration of the death penalty. It encompasses the finding of fact that increases the defendant's authorized punishment from life in prison to death."); *United States v. Bodkins*, 2005 WL 1118158, at *4-5 (W.D. Va. May 11, 2005) (holding that the eligibility phase of capital sentencing proceedings is the constitutionally critical phase, because it is the prerequisite to imposition of the death penalty); *see also Umana*, 750 F.3d at 347.

Thus, I find that the Confrontation Clause is inapplicable only at the selection phase.

48

IX.  **Mr. Con-ui's Second Supplemental Motion *in Limine* to "Exclude Numerous Recently-Provided Autopsy Photographs, an Enhanced Version of the Video of the Murder, Still Photographs of the Murder from the Video, and a Sentencing Memorandum by the State Prosecutor in Mr. Con-ui's Arizona Murder Conviction." (Doc. 950).**

Mr. Con-ui seeks to exclude eighty-five (85) photographs taken during the autopsy of Officer Williams; an "enhanced version of video surveillance tapes of the murder"; several "screen shots" from that video; and a sentencing memorandum prepared by an Arizona state prosecutor regarding the appropriate sentence for Mr. Con-ui's participation in a 2002 murder. (*Id*. at 1-2).

Consistent with this Memorandum and Order:

(1)     Mr. Con-ui's request to exclude an enhanced version of the murder video is subsumed under the disposition of Mr. Con-ui's Motion *in Limine* to Exclude the Presentation of the Video of the Murder, Photographs of Blood-stained Keys and Clothing, and Post-mortem Photographs of the Victim's Body (Doc. 922, at 36), where I barred the government from enhancing the video.

(2)     Mr. Con-ui's request to exclude still images from the video is subsumed under the disposition of Mr. Con-ui's Motion *in Limine* to Exclude the Presentation of the Video of the Murder, Photographs of Blood-stained Keys and Clothing, and Post-mortem Photographs of the Victim's Body (Doc. 922, at 36), where I allowed the presentation of five (5) still images at the penalty phase;

(3)     Mr. Con-ui's request to exclude the presentation of additional autopsy images is subsumed under the disposition of Mr. Con-ui's Motion *in Limine* to Exclude the Presentation of the Video of the Murder, Photographs of Blood-stained Keys and Clothing, and Post-mortem Photographs of the Victim's Body (Doc. 922, at 36), where I allowed the presentation of only five (5) autopsy photographs at the penalty phase; and

(4)     Mr. Con-ui's request to preclude the presentation of a prosecution

49

memorandum in Mr. Con-ui's 2008 murder conviction will be deferred, consistent with my disposition of Mr. Con-ui's Motion *in Limine* to Limit Proof of the Aggravating Factors Only to Those Facts Necessary to Establish a Conviction (Doc. 922, at 43).

In the Informational Outline, the government specified that there exist twenty-four (24) autopsy photographs that the government intended to introduce at trial. (*See* Doc. 883, at 2-3). Those photographs have been provided to the Court for an *in camera* review in connection with the instant motions. In light of the newly discovered additional eighty-five (85) autopsy photographs which I have not reviewed, the government will be permitted to select the five photographs for the presentation at the penalty phase only from the twenty-four (24) photographs listed in the Informational Outline. *See id*.

Finally, Local Rule 7.8 states that "[a] brief may address only one motion." Mr. Con-ui's bundling of *in limine* motions in Docket Document 922 and Document 950 does not comport with this rule. Future compliance with this Court's Local Rules is expected.

### III. Conclusion

Based on the above: (1) Mr. Con-ui's Motion *in Limine* to Exclude the Presentation of the "Video-tape of the Murder," Photographs of Blood-stained Keys and Clothing, and Post-mortem Photographs of the Victim's Body (Doc. 922, at 36), and Mr. Con-ui's Motion *in Limine* to "Limit the Evidence on the Statutory Aggravating Factor That the Murder of Officer Williams was Especially Heinous, Cruel and Depraved" (Doc. 922, at 52) will be GRANTED in part and DENIED in part; (2) Mr. Con-ui's Motion *in Limine* to Limit Victim-Impact Evidence to Members of the Victim's Family (Doc. 922, at 73) will be DENIED; (3) Mr. Con-ui's Motion *in Limine* to Exclude any Evidence That Is Not Particularly Relevant to One or More of the Statutory and Non-statutory Factors Alleged in the Amended Notice of Intent to Seek the Death Penalty (Doc. 922, at 42) will be NOTED; (4) Mr. Con-ui's Motion *in Limine* to Limit Proof of the Aggravating Factors Only to Those Facts Necessary to Establish a Conviction (Doc. 922, at 43) will be DENIED; (5) Mr. Con-ui's Motion *in Limine* to Bar Duplicative Use of Certain of the Aggravating Factors and Evidence (Doc. 922, at 47)

will be DENIED; (6) Mr. Con-ui's Motion *in Limine* to Limit or Exclude Evidence Related to Mr. Con-ui's Alleged Participation in Additional Uncharged Acts of Serious Violence and Attempted Acts of Serious Violence (Doc. 922, at 52) will be GRANTED in part and DENIED in part; (7) Mr. Con-ui's Request for a Reliability Hearing (Doc. 922, at 20) will be DENIED; (8) Mr. Con-ui's Motion *in Limine* to Exclude From All Phases of the Penalty Case Evidence That Does Not Meet the Standards of *Crawford v. Washington*, 541 U.S. 36 (2004) (Doc. 922, at 25) will be GRANTED in part and DENIED in part; (9) Mr. Con-ui's Supplemental Motion *in Limine* to Exclude Numerous Recently-Provided Photographs Related to the Murder and Firearms Convictions Alleged in the Notice of Aggravating Factors (Doc. 934) will be DEFERRED to the time of trial; (10) Mr. Con-ui's Second Supplemental Motion *in Limine* to "Exclude Numerous Recently-Provided Autopsy Photographs, an Enhanced Version of the Video of the Murder, Still Photographs of the Murder from the Video, and a Sentencing Memorandum by the State Prosecutor in Mr. Con-ui's Arizona Murder Conviction" (Doc. 950) will be DENIED in part, GRANTED in part, and DEFERRED to the time of trial in part; and (11) Mr. Con-ui's request for an Amended Informational Outline (Doc. 922, at 12) will be DENIED.

An appropriate order follows.


March 1, 2017                              /s/ A. Richard Caputo
Date                                      A. Richard Caputo
                                          United States District Judge