**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA

v.

JESSIE CON-UI,

Defendant.

No. 3:13-CR-123

(JUDGE CAPUTO)

## MEMORANDUM

Defendant Jessie Con-ui is charged by indictment with two capital offenses and one non-capital offense. (Doc. 1). Counts one and two of the indictment allege that, on February 25, 2013, Mr. Con-ui, while an inmate at the United States Penitentiary Canaan Federal Correctional Complex ("USP Canaan"), committed a first-degree murder of federal corrections officer Eric Williams ("Officer Williams"), in violation of 18 U.S.C. §§ 1111 and 1114(1). Count three alleges that Mr. Con-ui knowingly possessed a prohibited object, namely, a sharpened weapon, in violation of §§ 1791(a)(2), (d)(1)(B), and (b)(3).

On March 17, 2017, shortly before the commencement of his capital trial on April 24, 2017, Mr. Con-ui moved to suppress several un-Mirandized incriminatory statements he made to prison staff following the murder of Officer Williams on February 25, 2013. (Doc. 998, at 2).

A hearing on the motion was held on May 25, 2017. The motion has been fully briefed and is now ripe for disposition. I will address each statement identified by Mr. Con-ui as violative of his Fifth Amendment rights in turn.

## I. Legal Standard

A criminal defendant brings motions to suppress evidence under Federal Rule of Criminal Procedure 12(b)(3)(C). A defendant may move to suppress evidence obtained in violation of the Fifth Amendment to the United States Constitution's privilege against self-incrimination.

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To protect that right, the Supreme Court in *Miranda v. Arizona* ruled that police may not conduct a custodial interrogation without first administering the now-familiar *Miranda* warnings, which include the right to remain silent and the right to the presence of an attorney. 384 U.S. 436, 479 (1966); *accord Dickerson v. United States*, 530 U.S. 428, 443-44 (2000) (revisiting and reaffirming *Miranda* ). In general, if a suspect is not so warned, and does not thereafter make a knowing and voluntary waiver of those rights, the prosecution is barred from using statements obtained during the interrogation to establish its case in chief. *See Michigan v. Harvey*, 494 U.S. 344, 350 (1990); *cf. Harris v. New York*, 401 U.S. 222, 224-26 (1971) (holding that statements obtained in violation of *Miranda* may be admitted for impeachment purposes). Both inculpatory and exculpatory statements fall within the ambit of *Miranda*, 384 U.S. at 444. "A defendant's statements made in the course of a custodial interrogation are not admissible as evidence unless the defendant received appropriate warnings, or an exception applies." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999).

*Miranda* safeguards are required when a suspect is "(1) 'in custody' and (2) subject to 'interrogation' by the Government." 384 U.S. at 444; *see also Leese*, 176 F.3d at 743. A suspect is in custody when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)). An "interrogation" has been defined as "(a) conduct intentionally designed to evoke a confession, as well as (b) any conduct an officer should reasonably have foreseen would elicit an inculpatory response." *United States v. Bonner*, 469 Fed. Appx. 119, 126 (3d Cir. 2012) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). The term "interrogation" includes express questioning and any words or actions on the part of the police "that the

police should know are reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301. Consequently, an officer cannot be held responsible for an unforeseeable statement by the suspect. *Id.* at 301-02.

A statement is involuntary when the suspect's "will [is] overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulimante*, 499 U.S. 279, 288 (1991). Whether a statement is voluntarily made is determined from "'the totality of all the surrounding circumstances-both the characteristics of the accused and the details of the interrogation.'" *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

As a general rule, the burden of proof is on a defendant who seeks to suppress evidence. *Unites States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). However, once the defendant has established a basis for his motion, the government is required to prove by a preponderance of the evidence that the defendant's statements were not the product of custodial interrogation. *See United States v. DeSumma*, 44 F. Supp. 2d 700, 703 (E.D. Pa. 1999); *see also United States v. Barnes*, 2005 WL 1899502, at *2 (E.D. Pa. Aug. 8, 2005); *United States v. Prince*, 157 F. Supp. 2d 316, 324 (D. Del. 2001).

## II. Discussion

## 1.  Mr. Con-ui's Statements during an Exchange with Officer Boynton

Shortly after 10:00 p.m. on February 25, 2013 at USP Canaan, correctional officer Jeremy Bennett discovered Officer Williams on the floor of prison Unit C-1 (the "Unit"), unconscious and bleeding from wounds on his face, head, and neck. (T.R. 11-13, 31, 67, 107, Doc. 1152). No inmates were in sight; it appeared that all inmates had retreated to their cells, which encircled the unit. (T.R. 13). The doors to their cells, however, were unlocked. (T.R. 32-33, 89-90, 107, 123). Officer Bennett immediately summoned other officers who quickly descended on the unit. (T.R. 13).

Upon entering the unit and learning of Officer Williams's condition, Lieutenant Brian Sudul yelled out: "I'm going to kill one of you motherfuckers." (T.R. 34). All one hundred seventeen (117) inmates housed in the Unit at the time remained in their cells. (T.R. 13, 132). Lt. Sudul then armed himself with a pepper ball gun and ordered officers to lock all cells. (T.R. 33-34, 35). Over the course of approximately ten minutes, all sixty-four (64) cell doors were individually locked without incident. (T.R. 33-35, 68, 107-08; Doc. 998-4, at 2). After all of the inmates were secured, Lt. Sudul left the Unit to assess Officer Williams's condition in the medical unit. (T.R. 37).

As is standard procedure, the officers began conducting visual upper body searches of each inmate. (T.R. 36). Shortly afterwards, following the discovery of blood on the stairs leading to Mr. Con-ui's cell, Officer Ryan Boynton, along with other officers, approached Mr. Con-ui's cell. (T.R. 70, 92, 110, 124).

Officer Boynton performed a visual upper body check and noticed a cut on the palm of Mr. Con-ui's hand. (T.R. 93). Officer Boynton said, "Did you do this?" Mr. Con-ui nodded his head in the affirmative. (T.R. 93). Officer Boynton then said, "You did this? You killed him? Over what?" Mr. Con-ui responded, "Yes, disrespect issue." (T.R. 93-94). Officer Boynton noticed that Mr. Con-ui was holding a clear plastic knife. (T.R. 94). Officer Boynton ordered Mr. Con-ui to slide the knife under the door, but Mr. Con-ui said, "No, I'll keep it." (T.R. 94). Officer Boynton ordered him again to slide the knife under the door and Mr. Con-ui said, "No, you'll kill me." (T.R. 94).

Mr. Con-ui now seeks to suppress the above-cited statements, which, as is undisputed, were un-Mirandized. (See, e.g., T.R. 100). Specifically, Mr. Con-ui argues that he was subjected to "custodial interrogation" within the meaning of the Fifth Amendment when he made those statements. (Doc. 998, at 9-11).

As the Supreme Court has held, an inmate is not automatically in "custody" within

4

the meaning of *Miranda*. *Howes v. Fields*, 565 U.S. 499 (2012); *Burkholder v. Newton*, 116 Fed. Appx. 358, 361 (3d Cir. 2004); *United States v. Chamberlain*, 163 F.3d 499, 503 (8th Cir. 1999). Miranda warnings are required in prison interrogations only when there is a "change in the surroundings of the prisoner which results in an added imposition on his freedom of movement." *Burkholder*, 116 Fed. Appx. at 361 (quoting *United States v. Conley*, 779 F.2d 970, 973 (4th Cir. 1985)).

> It is true that taking a prisoner aside for questioning may necessitate some additional limitations on his freedom of movement. A prisoner may, for example, be removed from an exercise yard and taken, under close guard, to the room where the interview is to be held. But such procedures are an ordinary and familiar attribute of life behind bars. Escorts and special security precautions may be standard procedures regardless of the purpose for which an inmate is removed from his regular routine and taken to a special location.

*Howes*, 565 U.S. at 513. "Because restraint on freedom is the status quo of a prisoner, the courts examine the totality of the circumstances surrounding the interrogation to ascertain whether the defendant should be deemed 'in custody' for purposes of *Miranda*." *Bruce v. United States*, 439 F. Supp. 2d 364, 371 (M.D. Pa. 2006). The relevant factors include "the language or means used to summon the prisoner to the interrogation, the prisoner's freedom to leave the scene of the interrogation, the purpose, place and length of the interrogation, any added imposition on the prisoner's freedom of movement and whether circumstances suggest any measure of compulsion above and beyond confinement." *Id.* (quoting *United States v. Caro*, 2006 WL 1594185 at *1 n.1 (W.D. Va. June 2, 2006)); *see also Howes*, 565 U.S. at 514 ("When a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation," including the language used in summoning the prisoner to the interview, and the manner in which the interrogation is conducted).

As the Supreme Court has explained, *Miranda* applies to situations when an arrestee is subject to a "sharp and ominous change" in environment when arrested and then "whisked to a police station for questioning," because the shock of such a change "may give

5

rise to coercive pressures." *Howes*, 565 U.S. at 511. "By contrast, when a person who is already serving a term of imprisonment is questioned, there is usually no such change" in environment. *Id.* "Interrogated suspects who have previously been convicted of crime live in prison," and "[f]or a person serving a term of incarceration . . . the ordinary restrictions of prison life . . . are expected and familiar and thus do not involve the same 'inherently compelling pressures' that are often present when a suspect is yanked from familiar surroundings in the outside world and subjected to interrogation in a police station." *Id.* (citing *Maryland v. Shatzer*, 559 U.S. 98, 103 (2010)).

Here, I find that the totality of the facts and circumstances attendant to the exchange with Officer Boynton did not amount to custody for purposes of *Miranda*. Nothing suggests that any additional burden was imposed on Mr. Con-ui's otherwise constrained freedom of movement.

Mr. Con-ui was not free to leave his cell because he was an inmate and being confined to a locked cell was the normal and expected restraint on freedom he, along with hundreds of other inmates, experienced on a daily basis prior to the incident as a natural consequence of incarceration. (T.R. 11). Confinement inside a locked cell, at the time Mr. Con-ui made the statements at issue, was Mr. Con-ui's usual environment.

Although Mr. Con-ui was isolated from other inmates at the time he was approached by the officers, Mr. Con-ui was not removed from the prison population for the purposes of the questioning, and his isolation was again a result of the ordinary procedures requiring inmates to be locked in their cells in the evening. (T.R. 11). As the Supreme Court has held, "[i]solation from the general prison population . . . does not suggest on its own the atmosphere of coercion that concerned the Court in *Miranda*." *Howes*, 565 U.S. at 513. In no way was Mr. Con-ui "cut off from his normal life[.]" *Shatzer*, 559 U.S. at 106.

The manner in which the questioning was conducted also does not suggest a

coercive environment with which *Miranda* was concerned. Mr. Con-ui was interviewed in a non-coercive area - his own cell - and was not pressured to disclose any information. (T.R. 94, 95 (describing Mr. Con-ui as "relaxed, very calm")). There is nothing to suggest that a coercive tone or manner was employed by the officers, nor is there any evidence of deception or compulsion. (T.R. 94, 95). *See Shatzer*, 559 U.S. at 112 (stating that courts must assess "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*"). In fact, Mr. Con-ui felt free to exercise his right not to speak when he declined to answer Officer Ryan Swartzfager questions about the origin of the cuts on Mr. Con-ui's hand, which suggests an awareness on Mr. Con-ui's part that he could freely terminate the exchange under these circumstances. (T.R. 71).

No officer present during the exchange was armed; even if Mr. Con-ui was not aware of that, no weapons were drawn or displayed.[1] (T.R. 51). There is no evidence that Mr. Con-ui was formally placed under arrest or that he was bound or physically restrained by the officers. The visual body check conducted by the officers on Mr. Con-ui was also "an ordinary and familiar attribute of life behind bars," *Howes*, 565 U.S. at 513, as it was conducted on all inmates in the Unit as a result of the earlier incident. (T.R. 36-37, 69).

There is no evidence that the officers tricked or baited Mr. Con-ui or that aggressive questioning tactics were employed. Moreover, the questioning lasted no more than a few seconds. (T.R. 94-95). *Cf. Howes*, 565 U.S. at 515 (five-to-seven-hour prison interview that "continued well past the hour when respondent generally went to bed" was non-custodial).

---

[1] Mr. Con-ui argues that there was an added imposition on his freedom of movement and he was subjected to treatment that rendered him in custody because Lt. Sudul ordered the cell extraction team to physically remove Mr. Con-ui, if necessary. (Doc. 998, at 10). There is, however, nothing in the record to suggest that Mr. Con-ui heard Lt. Sudul's order to prepare for cell extraction, and the extraction team never entered the Unit. (Doc. 48, 62, 96).

Mr. Con-ui was also never told that he was considered a suspect. *See Stansbury v. California*, 511 U.S. 318, 325 (1994) (although officers' statements to suspects are relevant to custody analysis, "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue").[2] Thus, a reasonable person in Mr. Con-ui's position would have understood himself not to be "in custody" but, rather, to be free to discontinue the brief conversation.

Thus, the circumstances discussed above did not create a custodial environment for purposes of *Miranda*. There was no "change in the surroundings of the prisoner which result[ed] in an added imposition on his freedom of movement." *Cervantes*, 589 F.2d at 428. Mr. Con-ui was already locked in his cell at the time of the exchange at issue, and there were no changes in his circumstances which would signify the "inherently coercive pressures" contemplated by the *Miranda* Court. *Fields*, 565 U.S. at 509. It is thus clear that the statements were not elicited in a custodial setting. *See Wilson v. Cain*, 641 F.3d 96, 100-04 (5th Cir. 2011); *United States v. Armstrong*, 2010 WL 3981005, at *10 (W.D. Pa. Oct. 8, 2010), *aff'd sub nom. United States v. Diehl-Armstrong*, 504 Fed. Appx. 152 (3d Cir. 2012); *United States v. Melancon*, 2010 WL 324007, at *7 (E.D. La. Jan. 21, 2010), *aff'd*, 662 F.3d 708 (5th Cir. 2011); *see also United States v. Conley*, 779 F.2d 970, 974 (4th Cir. 1985).

Finally, whether or not Mr. Con-ui was subjected to an interrogation does not affect the conclusion of the foregoing inquiry. As I have found, Mr. Con-ui was not "in custody,"

---

[2] Mr. Con-ui points to his status as a suspect to argue that he was in custody. Arguably, any conversation between law enforcement and a possible suspect may be inherently more coercive than conversation with a potential victim or a witness. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). However, if that fact alone were sufficient to render an environment custodial for *Miranda* purposes, any interrogation would be custodial. To the contrary, the Supreme Court has repeatedly refused to adopt per se rules in this context and has declined to allow any one factor to control the custody analysis. *See, e.g., Howes*, 565 U.S. at 514.

and thus, not under "custodial interrogation." Therefore, *Miranda* warnings were not warranted. Accordingly, the statements will not be suppressed.

**2.    Mr. Con-ui's Statement to Officer Celuck**

Mr. Con-ui's second challenge concerns a statement he made to Officer William Celuck shortly after Mr. Con-ui's exchange with Officer Boynton. At that time, Officers Celuck and Mark Turner were ordered to stay by Mr. Con-ui's cell while the extraction team geared up in case Mr. Con-ui refused to leave his cell. (T.R. 112, 125). As Officer Celuck was standing in front of Mr. Con-ui's cell door, he heard Mr. Con-ui say, "He disrespected me, CO, he disrespected me, CO." (T.R. 111, 126).

Similarly to Mr. Con-ui's statements to Officer Boynton, I find that Mr. Con-ui was not in custody for the purposes of the Fifth Amendment when he made the above-cited statements to Officer Celuck. Thus, the analysis of Mr. Con-ui's custodial status in the preceding section is fully applicable here.

Moreover, under the totality of the circumstances, as established through the credible testimony at the hearing, I find that Mr. Con-ui was not subject to interrogation because he volunteered his statements to Officer Celuck. The statement was made by Mr. Con-ui without any prompting by Officer Celuck, or any other officer, and was not made in response to any questioning. (T.R. 125-26). "Voluntary confessions are not merely a proper element in law enforcement, they are an unmitigated good, essential to society's compelling interest in finding, convicting, and punishing those who violate the law." *Shatzer*, 559 U.S. at 108 (internal quotation marks and citations omitted). As such, Mr. Con-ui's voluntarily statement to Officer Celuck will not be suppressed.

**3.    Mr. Con-ui's Statement While Being Escorted by Lieutenant Sudul**

Mr. Con-ui next seeks to suppress a statement he made to Lt. Sudul while being escorted to a holding cell in Lt. Sudul's office.

Shortly after Mr. Con-ui's statements to Officer Celuck, Lt. Sudul returned to the Unit (T.R. 39) and, after reassuring Mr. Con-ui that he would not be harmed, (T.R. 39, 52), he ordered the extraction team to stand down, placed Mr. Con-ui in restraints, removed him from his cell, and locked him in a holding cage in his office. (T.R. 40-42). While being escorted to the holding cage, Mr. Con-ui said, "Hey man, I am sorry but I had to do what I had to do. I am sick of all your people's disrespect." (T.R. 55, 115).

As to Mr. Con-ui's custodial status, I find that he was subjected to a restraint on freedom of movement "of the degree associated with a formal arrest" when he was being moved to the holding cage. *Conley*, 779 F.3d at 973. Given that Mr. Con-ui was placed in restraints, removed from the cell, and escorted by a squadron of officers to an isolated holding cell (T.R. 54, 56), I find that there was a "change in the surroundings of [Mr. Con-ui] which result[ed] in an added imposition on his freedom of movement." *Burkholder*, 116 Fed. Appx. at 361 (quoting *United States v. Conley*, 779 F.2d 970, 973 (4th Cir. 1985)). Thus, he was in custody for the purposes of the Fifth Amendment.

It is well-settled law, however, that statements made by a person spontaneously or without prompting after being placed in custody are not subject to exclusion at trial. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). Interrogation, for the purposes of the Fifth Amendment, is defined as express questioning or "any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Browlee*, 454 F.3d 131, 146 (3d Cir. 2006) (quoting *Innis*, 446 U.S. at 300-01).

Here, both Lt. Sudul (T.R. 41) and Officer Turner (T.R. 115) credibly testified that the statement at issue was made by Mr. Con-ui without any prompting or questioning. There is nothing to suggest that the officers engaged Mr. Con-ui in any way; in fact, the officers were specifically ordered "not to speak to [Mr.] Con-ui." (T.R. 73). No conduct on the part

of the escorting officers was intended to, or was reasonably likely to, elicit an incriminating response. Notably, after Mr. Con-ui made the statement at issue, Lt. Sudul responded, "Listen, man, *Miranda* doesn't apply to me. I suggest you remain silent." (T.R. 42; Doc. 998-2, at 3). Thus, I find that Mr. Con-ui's statement was voluntary, unsolicited, and not made in response to any questions. As such, Mr. Con-ui's statement is outside of *Miranda*'s protections and will not be suppressed.

### 4. Mr. Con-ui's Response to Officer Bennett's Question

Mr. Con-ui next seeks to suppress a nonverbal response to Officer Bennett's question. According to the government, after Mr. Con-ui was placed in the holding cell in Lt. Sudul's office, Officer Bennett, who had just learned that Officer Williams died, opened the door to Lt. Sudul's office and asked Mr. Con-ui, "Why?" (T.R. 15-16). In response, according to Officer Bennett, Mr. Con-ui smiled and laughed. (T.R. 24).

At the suppression hearing, Officer Bennett testified:

> When I walked past the lieutenant's office, I saw Con-ui in there. And I asked . . . Lieutenant Sudul, that night, I said, is that him, and he said, yes. And I opened up the lieutenant's office door, peeked my head in, and I just yelled why. . . . I was not expecting an answer. When I asked why, he just smiled at me and let out a little laugh.

(T.R. 15). Officer Bennett's testimony, however, is not corroborated by the staff memorandum he completed on February 25, 2013, which omits any mention of the exchange with Mr. Con-ui in Lt. Sudul's office. (T.R. 16; Gov't Ex. 5). His explanation as to the omission, that "[it] was not on [his] mind doing the report at the time," (T.R. 17, 20, 22) is unconvincing. Officer Bennett also admitted that he "never discussed" the interaction he had with Mr. Con-ui until his interview with the Federal Bureau of Investigation some three years after the murder of Officer Williams. (T.R. 22-23; Doc. 998-1). In fact, Lt. Sudul learned of Officer Bennett's interaction with Mr. Con-ui for the first time at the suppression hearing, when questioned by defense counsel. (T.R. 58).

11

Officer Bennett also stated that he was able to enter the lieutenant's office because its door was unlocked. (T.R. 19). However, Lt. Sudul testified that he personally locked the door to the office. (T.R. 59-60). As such, Officer Bennett's account is not supported by the credible testimony of Lt. Sudul.

Moreover, although a camera was set up in front of Mr. Con-ui's holding cage, (T.R. 26, 27, 57, 58, 62; Doc. 998-1, at 3), the government presented no evidence that Officer Bennett's interaction with Mr. Con-ui was captured on video, even though the camera, which recorded audio as well as video, would have been recording when Officer Bennett entered the lieutenant's office. (T.R. 62).

Thus, I find that the preponderance of the evidence does not establish that Mr. Con-ui's nonverbal statements at issue were made. As such, the testimony about those statements will be precluded.

**5.    Mr. Con-ui's Statements to Prison Psychologist John Mitchell**

Next, Mr. Con-ui seeks to suppress certain statements he made during an evaluation conducted by Dr. John Mitchell, the chief psychologist at the United States Penitentiary at Allenwood ("USP Allenwood"), on February 27, 2013. (T.R. 135). During the evaluation, Mr. Con-ui stated, *inter alia*, that "disrespect" was the primary reason that led to the incident at USP Canaan. (T.R. 145; Doc. 998-5; Gov't Ex. 6). Mr. Con-ui further stated that he had "swallowed a lot" with regards to the disrespect from Officer Williams and felt like he could not tolerate such disrespect from him any longer. (T.R. 145; Doc. 998-5; Gov't Ex. 6). Mr. Con-ui also stated that he had "overreacted." (T.R. 145; Doc. 998-5; Gov't Ex. 6) (collectively, the "Mitchell statements"). Because I find that the Mitchell statements were the product of a custodial interrogation unaccompanied by a prior *Miranda* warning, they will be suppressed.

Mr. Con-ui was transferred from USP Canaan to USP Allenwood after the incident

involving Officer Williams occurred on the night of February 25, 2013. (*See* T.R. 136). He was placed in an observation cell in "health services" and subjected to ambulatory restraints. (T.R. 136, 148-49). The interview with Dr. Mitchell occurred the next day while Mr. Con-ui was in the same observation cell.[3] (T.R. 138, 152). Mr. Con-ui was not provided with any advance notice prior to Dr. Mitchell's arrival for the evaluation. (T.R. 148). Dr. Mitchell was accompanied by two officers during the evaluation: Captain Gabrielson and Lieutenant Stover. (T.R. 148). Throughout the interview, Mr. Con-ui continued to be restricted by ambulatory restraints, which Dr. Mitchell described as "a belly chain around [Mr. Con-ui's] waist that was connected to hand restraints as well." (T.R. 149:6-7). Dr. Mitchell testified that the purposes of the interview were to conduct a mental health evaluation in connection with a referral to USP, Administrative Maximum Facility in Colorado ("ADX"), and to assess whether there was any psychological reason to keep Mr. Con-ui in restraints. (T.R. 137). Mr. Con-ui initially declined to answer questions about the attack on Officer Williams, but subsequently made statements concerning the incident in response to follow-up questions posed by Dr. Mitchell. (T.R. 153-55; Gov't Ex. 6). However, Dr. Mitchell was not the only prison employee who posed questions to Mr. Con-ui. Captain Gabrielson also asked Mr. Con-ui questions during the course of the interview. (T.R. 153, 155). Dr. Mitchell testified that Captain Gabrielson asked Mr. Con-ui questions about the attack on Officer Williams, although he could not recall the specific nature of the inquiries. (T.R. 155). Prior to conducting this evaluation, Dr. Mitchell was informed of the assault that Mr. Con-ui allegedly perpetrated upon Officer Williams. (T.R. 140, 149, 156). Mr. Con-ui was not provided with a *Miranda* warning before the evaluation. (T.R. 150). This encounter

---

[3] Although unclear from the hearing, the government noted in its Brief in Opposition that Dr. Mitchell conducted the interview "from an adjoining observation cell." (Doc. 1011, at 27). The officers who also attended the evaluation were in the same adjoining observation cell as Dr. Mitchell. (*Id.*)

lasted twenty-five to thirty minutes (T.R. 147).

A prison psychologist may be required to issue a *Miranda* warning before conducting an interview of an inmate. *See Burkholder v. Newton*, 116 Fed. Appx. 358, 361 (3d Cir. 2004) (citing *Estelle v. Smith*, 451 U.S. 454, 465 (1981)) ("A prison psychologist is required to give *Miranda* warnings before conducting an interrogation."). Of course, in order for such a warning to be required, the prerequisites for *Miranda* still must be satisfied: the inmate must be in "custody" and subject to an "interrogation." *See Jackson v. Conway*, 763 F.3d 115, 136-37, 139 (2d Cir. 2014) (noting that non-law- enforcement officials may be required to give *Miranda* warnings prior to questioning if the person being questioned is in "custody" and the official objectively "should have known" that his questions were "reasonably likely to evoke an incriminating response" (quoting *Rhode Island v. Innis*, 446 U.S. 291, 302 (1980) (emphasis removed))).

First, as previously explained with regards to the "custody" inquiry, I must assess whether there was a "change in the surroundings of [Mr. Con-ui] which result[ed] in an added imposition on his freedom of movement." *Burkholder*, 116 Fed. Appx. at 361 (quoting *United States v. Conley*, 779 F.2d 970, 973 (4th Cir. 1985)). As explained by the Third Circuit, "[s]uch a change in surroundings could include the imposition of handcuffs or being taken to a locked room to be questioned by correctional officers." *Id.* (citing *Conley*, 779 F.2d at 970). Courts employ a totality of the circumstances approach and consider "whether the circumstances suggest any measure of compulsion above and beyond confinement." *Bruce v. United States*, 439 F. Supp. 2d 364, 371 (M.D. Pa. 2006) (citation omitted). At bottom, "[a]n inmate who is removed from the general prison population for questioning and is 'thereafter . . . subjected to treatment' in connection with the interrogation 'that renders him "in custody" for practical purposes . . . will be entitled to the full panoply of protections prescribed by *Miranda*.'" *Howes v. Fields*, 565 U.S. 499, 514 (2012) (quoting *Berkemer v.*

*McCarty*, 468 U.S. 420, 440 (1984)).

Upon examining the totality of the circumstances, I find that Mr. Con-ui was in "custody" for the purposes of *Miranda* during the evaluation conducted by Dr. Mitchell. While "imprisonment alone is not enough to create a custodial situation within the meaning of *Miranda*," *Howes*, 565 U.S. at 511, the circumstances surrounding Dr. Mitchell's interview of Mr. Con-ui rendered him in "custody" for practical purposes in the prison context.

First, Mr. Con-ui was interviewed in an observation cell at USP Allenwood where he had been placed less than forty-eight hours earlier after being transferred from USP Canaan. Thus, Mr. Con-ui was not merely subjected to the "ordinary restrictions of prison life," but instead was questioned in a new and unfamiliar environment after having been "yanked" from his familiar setting at USP Canaan. *See Howes*, 565 U.S. at 511.

Second, Mr. Con-ui's movements were restricted by ambulatory restraints, which Dr. Mitchell described as "a belly chain around [Mr. Con-ui's] waist that was connected to hand restraints as well." (T.R. 149:6-7). Accordingly, Mr. Con-ui was undoubtedly physically restrained in a manner greater than that to which he was generally accustomed in his ordinary prison life. *Cf. Howes*, 565 U.S. at 515.

Third, Dr. Mitchell was accompanied by two law enforcement officials during the evaluation, one of whom, Captain Gabrielson, posed his own questions to Mr. Con-ui about the attack on Officer Williams. *Cf. United States v. Gojah*, 553 Fed. Appx. 159, 162 (3d Cir. 2014) (finding no "custody" when, *inter alia*, the inmate was interrogated by a "companionless, unarmed agent"). Thus, there was an express presence of law enforcement during the interview. Moreover, considering that Captain Gabrielson interjected with his own questions, the manner in which the evaluation was conducted appears to have exceeded a routine medical assessment.

Fourth and relatedly, considering that Mr. Con-ui was in an isolated observation cell

15

under ambulatory restraints and confronted by Dr. Mitchell, a captain, and a lieutenant without prior notice, I find it readily apparent that the evaluation took place under circumstances in which Mr. Con-ui did not feel free to end the interview, as understood in the prison context. *Cf. Howes*, 565 U.S. at 515-17. Although Dr. Mitchell informed Mr. Con-ui that information from the evaluation could later be subpoenaed for use at trial (T.R. 140), there is no indication that Dr. Mitchell ever informed Mr. Con-ui that he was free to not answer his or Captain Gabrielson's questions. *Cf. id.* at 517; *Gojah*, 553 Fed. Appx. at 162. Indeed, given these circumstances, the fact that Mr. Con-ui initially declined to speak about the incident at USP Canaan, but subsequently made statements in response to continued questioning on the subject, suggests that he did not feel free to end the interview.

Accordingly, I conclude that Mr. Con-ui was in "custody" for the purposes of *Miranda* during the interview with Dr. Mitchell and the two officers.

Having found Mr. Con-ui to have been in "custody," I turn next to the "interrogation" inquiry. In so doing, I must assess whether the officials who posed questions to Mr. Con-ui "should have known" that their questions were "reasonably likely to evoke an incriminating response." *Innis*, 446 U.S. at 302 (emphasis removed).

I first address the fact that Dr. Mitchell is not a law enforcement official, but instead is a prison psychologist. Although Dr. Mitchell was not engaged in law-enforcement activity when conducting his evaluation of Mr. Con-ui, "where, as here, custody (as that term is used in *Miranda* and its progeny) is not at issue, whether the questioning official was engaged in 'law enforcement activity' at the time incriminating statements are made is not the touchstone for applying the *Miranda* warning requirements." *Jackson*, 763 F.3d at 138 (citing *Mathis v. United States*, 391 U.S. 1, 4 (1968)). Rather, the pertinent inquiry is whether the questioning official "'should have known' that [his] questions were 'reasonably likely to evoke an incriminating response.'" *Jackson*, 763 F.3d at 139 (quoting *Innis*, 446

U.S. at 302); *see Burkholder*, 116 Fed. Appx. at 361 ("A prison psychologist is required to give *Miranda* warnings *before conducting an interrogation*.") (emphasis added). Accordingly, Dr. Mitchell's status as a prison psychologist does not, by itself, remove his questioning from the purview of *Miranda*.

However, the fact that Dr. Mitchell was flanked by two officers during the course of the interview–one of whom posed questions to Mr. Con-ui about the attack on Officer Williams specifically–is quite notable, because it indicates that the evaluation was not entirely outside the ambit of law-enforcement activity. *See Estelle v. Smith*, 451 U.S. 454, 467 (1981) (finding it "immaterial" for the purposes of *Miranda* that an inmate was questioned by a prison psychiatrist rather than a police officer because the psychiatrist's "role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting"); *cf. Powell v. Quarterman*, 536 F.3d 325, 343 (5th Cir. 2008) (finding no *Miranda* violation when an emergency room doctor testified about the defendant's answers to questions posed during a post-arrest examination because the doctor "was not acting as an agent of the State when he conducted the examination" of the defendant). This particular circumstance surrounding the interview suggests that Dr. Mitchell's purposes as a psychological evaluator blurred with the aims of law enforcement officials, as Captain Gabrielson participated in the questioning of Mr. Con-ui and inquired into the attack on Officer Williams. (T.R. 155). Considering that Captain Gabrielson is not a psychologist (T.R. 153), I do not find that this encounter falls within the scope of a standard psychological evaluation of an inmate. Moreover, it would be inappropriate to allow law enforcement officials to effectively sidestep the mandate of *Miranda* by simply accompanying prison psychologists to an inmate evaluation and, once inside, posing questions to the inmate seeking incriminating responses under the guise of a routine psychological evaluation. Furthermore, as the burden is on the government to

demonstrate that Mr. Con-ui's statements were not the product of a custodial interrogation, the fact that Dr. Mitchell was unable to distinguish the questions he advanced regarding the attack on Officer Williams from those posed by Captain Gabrielson counsel in favor of finding an "interrogation." (*See* T.R. 153, 155).

Even assuming all of the Mitchell statements Mr. Con-ui seeks to suppress were made in response to questions that are attributable to Dr. Mitchell, I find that Dr. Mitchell's questioning constituted an "interrogation" for the purposes of *Miranda* under these circumstances. At the time he conducted the evaluation, Dr. Mitchell was clearly aware of the possibility that Mr. Con-ui would face criminal prosecution: Dr. Mitchell was informed of the allegations against Mr. Con-ui prior to conducting the interview (T.R. 149, 156), Mr. Con-ui had just been transferred to USP Allenwood due to the allegations surrounding the attack on Officer Williams at USP Canaan (T.R. 140), and Dr. Mitchell told Mr. Con-ui that the information from the evaluation could possibly be subpoenaed if he went to trial (T.R. 140, 150-51).[4] Dr. Mitchell was aware of why Mr. Con-ui was in custody and being housed in an observation cell at USP Allenwood. Thus, it is clear that Dr. Mitchell should have known that questions regarding the details of the attack on Officer Williams[5] could elicit an incriminating response. *See Jackson*, 763 F.3d at 139 (finding a social worker's interview of an inmate

---

[4] The government does not contend that this "warning" satisfied the requirements of *Miranda*. Indeed, Dr. Mitchell testified that neither he nor the officers present during the evaluation advised Mr. Con-ui of his right to remain silent at any time. (T.R. 150). Moreover, Dr. Mitchell provided the government with information stemming from the evaluation without having been issued a subpoena. (T.R. 151-52). As such, the Court does not find that this advisement "reasonably conveyed" to Mr. Con-ui his rights as required by *Miranda*. *United States v. Warren*, 642 F.3d 182, 184 (3d Cir. 2011) (quoting *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989)).

[5] In his testimony, Dr. Mitchell stated that his follow-up question regarding the incident at USP Canaan was generally phrased as follows: "[W]hat went wrong at Canaan, how come you [Mr. Con-ui] weren't able to continue to do your time there without incident[?]" (T.R. 155).

was an "interrogation" because the social worker "should have known" that her express questioning about a minor's rape allegations could "elicit an incriminating response," considering that the defendant was in custody as a result of the same sexual abuse allegations which were the subject of the questioning); *cf. Saranchak v. Beard*, 616 F.3d 292, 303-05 (3d Cir. 2010) (finding a CYS case worker's interview of an incarcerated defendant was not an "interrogation" because the questioning was "not made for the purpose of soliciting information from [defendant] about the crimes"); *Burkholder*, 116 Fed. Appx. at 361 (finding no "interrogation" when there was no allegation that the prison psychiatrist asked the defendant questions about possible criminal activities, and the defendant instead "freely and spontaneously" made threatening statements subsequently used against him).

Because Dr. Mitchell objectively should have known that questions regarding the incident at USP Canaan were reasonably likely to evoke an incriminating response, and because Mr. Con-ui was not given a proper *Miranda* warning prior to this questioning, I will grant Mr. Con-ui's Motion to suppress the Mitchell statements.

### 6.  Mr. Con-ui's Statements Were Voluntary

Separate from his *Miranda* argument, Mr. Con-ui contends that certain statements he made were involuntary and therefore are inadmissible. Specifically, Mr. Con-ui argues that all of his "inculpatory statements" made after hearing Lt. Sudul state, "I am going to kill one of you motherfuckers," were involuntary. (*See* Doc. 998, at 13). Because I find that Mr. Con-ui's will was not overborne and that his capacity for self-determination was not critically impaired, I will not preclude his statements on the ground that they were involuntary.

Around 10:15 p.m. on the night Officer Williams was attacked, Lt. Sudul received a radio transmission from Officer Bennett requesting assistance and noting that "weapons [were] involved." (T.R. 31). Lt. Sudul responded to the call and arrived at the Unit soon

thereafter. (T.R. 31-32). Upon arriving at the Unit, Lt. Sudul recognized Officer Williams on the floor and saw that he was injured. (T.R. 32). Lt. Sudul then shouted "I am going to kill one of you motherfuckers." (T.R. 34; Doc. 998-2, at 1). Lt. Sudul testified that the purpose for this statement was to "shock" the other inmates in order to convey the seriousness of the situation, and also to indicate that Lt. Sudul would use the "appropriate amount of force" as necessary, "including deadly force." (T.R. 34). Lt. Sudul further testified that he was unaware of the identity of any assailant(s) at that time and did not know the circumstances surrounding Officer Williams's injuries. (T.R. 34). Lt. Sudul noted that after medical aid began to be administered to Officer Williams in the Unit, he realized that all of the cell doors were unlocked. (T.R. 32-33). Lt. Sudul, along with other members of the corrections staff, began the process of manually locking each of the sixty-four cells in the Unit. (T.R. 33-35). Lt. Sudul led the team in this process and was in possession of a pepper ball launcher at this time, which he described as a "less lethal device" that fires a small hardened projectile designed to cause a chemical reaction that affects the mucus membranes in a person's nose and mouth. (T.R. 33-36). After all of the cells were locked, the team proceeded to conduct an upper body search of each inmate in the Unit, cell-by-cell. (T.R. 36).

After the Unit was secured, Lt. Sudul went to the medical unit to check on Officer Williams, leaving Officer Swartzfager, Officer Boynton, and Officer Baux in charge of the upper body checks. (T.R. 37-38, 46). Officer Boynton proceeded to the second floor of the Unit and, upon conducting an upper body search of the inmate in cell 221, noticed a cut on the inmate's hand. (T.R. 92-93). This inmate was Mr. Con-ui. (T.R. 92). Officer Boynton turned around and told Officer Swartzfager to contact Lt. Sudul.[6] (T.R. 94). Upon turning

---

[6] According to Officer Swartzfager's testimony, he reached Mr. Con-ui's cell prior to Officer Boynton and recognized blood on Mr. Con-ui's hands. (T.R. 70-71). Officer Swartzfager testified that Mr. Con-ui was unresponsive to his questions and appeared "[m]otionless" with a "cold dead stare." (T.R. 71). Officer Swartzfager radioed Lt. Sudul that "we found him," and

back to Mr. Con-ui, Officer Boynton noticed a plexiglass weapon in Mr. Con-ui's hand. (T.R. 94). Officer Boynton told Mr. Con-ui to slide the weapon under the door, to which Mr. Con-ui responded "no" because "you guys are going to kill me." (T.R. 94). Officer Boynton responded, "I would like to [kill you,] but the cameras are watching." (T.R. 94). Mr. Con-ui then placed the weapon in the sink in the cell. (T.R. 95). Officer Boynton testified that Mr. Con-ui appeared "[r]elaxed, very calm" during this exchange. (T.R. 95).

Lt. Sudul was notified via radio that the officers had an inmate armed in his cell. (T.R. 38, 72). Lt. Sudul ordered Officer Celuck and Officer Turner to stay back and told the rest of the team to head to the green corridor in order to prepare for a cell extraction. (T.R. 38, 95). Officer Turner testified that Mr. Con-ui appeared to have a "calm" demeanor around this time (T.R. 113), and Officer Celuck testified that Mr. Con-ui displayed "[n]o emotion," (T.R. 126). Lt. Sudul returned to the Unit and went to Mr. Con-ui's cell. (T.R. 39). Lt. Sudul no longer had the pepper ball launcher on him when he reached Mr. Con-ui's cell,[7] and neither Officer Celuck nor Officer Turner had any weapons on them. (T.R. 51). Lt. Sudul told Mr. Con-ui that he needed to submit to the application of restraints. (T.R. 39). Lt. Sudul noticed a plexiglass sharpened weapon in the sink in the cell. (T.R. 40). Mr. Con-ui refused to submit to restraints initially, commenting that he had "heard what [Lt. Sudul] said when [he] first came in [to the Unit] and I don't know if I want to do that." (T.R. 39; Doc. 998-2, at 3). Lt. Sudul reassured Mr. Con-ui that no harm was going to come to him. (T.R. 39-40). Mr. Con-ui agreed to turn over the weapon to Lt. Sudul, first attempting to slide it under the door

---

proceeded to conduct upper body checks of other inmates. (T.R. 71-72). Thereafter, Officer Boynton arrived at Mr. Con-ui's cell. (T.R. 72).

[7] Officer Swartzfager testified that he took possession of the pepper ball launcher after Lt. Sudul left the Unit to check on Officer Williams. (T.R. 70). Officer Swartzfager subsequently left the Unit after Lt. Sudul ordered the majority of the senior officers on the scene to prepare for a cell extraction, presumably taking the pepper ball launcher with him. (T.R. 72-73).

unsuccessfully and ultimately dropping it through the food slot. (T.R. 40). After receiving reassurances from Lt. Sudul, Mr. Con-ui placed his hands through the food slot voluntarily, was placed into handcuffs, and removed from the cell. (T.R. 40). Lt. Sudul, along with Officer Turner, proceeded to walk Mr. Con-ui down the stairs, around the crime scene, and up through the sally port to the secure corridor. (T.R. 41). Lt. Sudul placed his hands on Mr. Con-ui's handcuffs and left elbow during this escort.[8] (T.R. 54). No questions were posed to Mr. Con-ui at any point during the transfer. (T.R. 41, 115). An extraction team was never called to Mr. Con-ui's cell. (T.R. 96).

When they reached the sally port area, Mr. Con-ui stated: "Hey man, I am sorry but I had to do what I had to do. I am sick of all your people's disrespect." (T.R. 41; Doc. 998-2, at 3). Lt. Sudul responded that "*Miranda* doesn't apply to me. I suggest you remain silent." (T.R. 42; Doc. 998-2, at 3). Upon reaching the red corridor, Mr. Con-ui was placed in the lieutenant's office holding cage, and his hand restraints were removed. (T.R. 42).

A statement made to a law enforcement officer is inadmissible if it was "involuntary." *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973)). "[A]n involuntary confession may result from psychological, as well as physical, coercion." *Miller v. Fenton*, 796 F.2d 598, 603 (3d Cir. 1986). However, there is no "*per se* rule" for determining whether a confession is involuntary when the coercion alleged is psychological in nature. *See id.* at 604. An individual's statement is made involuntarily in violation of the Fifth Amendment if, under the totality of the circumstances, the Court finds that the "individual's will is overborne or that person's capacity for self-determination is critically impaired. . . ." *Jacobs*, 431 F.3d at 108 (citation omitted). As further explained by the Third Circuit:

---

[8] Officer Turner testified that he took physical control of Mr. Con-ui prior to entering the sally port area after noticing that Lt. Sudul did not have on gloves. (T.R. 115). This minor factual discrepancy has no bearing on my conclusion.

> A suspect's background and experience, including prior dealings with the criminal justice system, should be taken into account in the voluntariness inquiry. *See Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983) (plurality opinion); *United States v. Velasquez*, 885 F.2d 1076, 1086 (3d Cir. 1989). A necessary predicate to a finding of involuntariness is coercive police activity. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Further, there must be some causal connection between the police conduct and the confession. *Id.* at 164. The burden is on the Government to establish, by a preponderance of the evidence, that a challenged statement was voluntary. *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

*Id.* at 108-09. In addition to a party's prior dealings with the criminal justice system, courts should also consider: (a) the youth of the accused, (b) the accused's lack of education or his low intelligence, (c) the lack of any advice to the accused of his constitutional rights, (d) the length of detention, (e) the repeated and prolonged nature of questioning, and (f) the use of physical punishment such as the deprivation of food or sleep. *Miller*, 796 F.2d at 604 (citing *Schneckloth*, 412 U.S. at 226). While there must be a causal connection between the police conduct at issue and the allegedly involuntary statements, the proper inquiry is whether the officer's statements "were so manipulative or coercive that they deprived [the accused] of his ability to make an unconstrained, autonomous decision to confess." *Id.* at 605; *see also United States v. Wade*, 956 F. Supp. 2d 638, 657 (W.D. Pa. 2013), *aff'd in part*, 628 Fed. Appx. 144 (3d Cir. 2015) ("A defendant challenging the voluntariness of a confession must establish 'the essential link between coercive activity [by the police], on the one hand, and a resulting confession by a defendant, on the other.'" (quoting *Colorado v. Connelly*, 479 U.S. 157, 165 (1986))).

In *Arizona v. Fulminante*, 499 U.S. 279 (1991), the Supreme Court found an inmate's inculpatory statements were involuntary. The inmate was approached by a government informant, who indirectly threatened the inmate by stating that he would not protect the inmate from other prisoners unless the inmate confessed to his involvement in another crime. *See id.* at 288. The Supreme Court accepted the lower court's finding that this indirect threat of violence was credible. *See id.* at 287-88. The record further evidenced that the inmate's personal characteristics rendered him susceptible to that threat. *See id.* at 286 n.2. Based on the credible indirect threat of physical harm by other inmates, coupled with

evidence indicating that the inmate was susceptible to such a threat, the Supreme Court held that the accused's confession was involuntary. *See id.* at 288.

Similarly, the Third Circuit found a defendant's incriminating responses to have been involuntary when undercover officers threatened her with gang violence unless the defendant satisfied payment on a murder-for-hire contract. *Lam v. Kelchner*, 304 F.3d 256, 265 (3d Cir. 2002). Specifically, the undercover officers indicated that the defendant would be killed if she did not pay the balance due on the contract. *See id.* at 260. The court concluded that the threat was made directly at the defendant, and found that the record contained "no evidence that [her] personal characteristics would render her impervious to such a direct threat of physical violence." *Id.* at 265. Instead, the record indicated that her background and experience made her susceptible to such threats. *See id.* at 265-66. Moreover, the record demonstrated that the defendant displayed signs which indicated that she was affected by the agents' coercive tactics. *See id.* (noting defendant provided undisputed testimony that she was "actually afraid" that the officers would physically hurt her and that she "believed" they were gang members); *see also United States v. Rose*, 189 F. Supp. 3d 528, 542 (D.V.I. 2016) (finding defendant's incriminating response was "involuntary" when officers were pointing their weapons at the defendant and there was evidence indicating he appeared "very nervous").

Under the circumstances of this case, I do not find that the statements made by Mr. Con-ui after Officer Williams was attacked were involuntary. First, I do not find that Lt. Sudul's lone comment, although threatening, was "so manipulative or coercive that [it] deprived [Mr. Con-ui] of his ability to make an unconstrained, autonomous decision to confess." *Miller*, 796 F.2d at 605. Unlike the defendants in *Fulminante* and *Lam*, Lt. Sudul did not use threats of physical harm in an effort to extract incriminatory statements from Mr. Con-ui. *See United States v. Taylor*, 660 F. Supp. 2d 1230, 1241 (D.N.M. 2009) (citing *Fulminante* and *Lam*). Indeed, at the time the comment was made, Lt. Sudul was unaware of the identity of the assailant(s), and he directed the remark to all of the inmates in the Unit, which contained sixty-four cells. (*See* T.R. 34-35). Accordingly, I do not find that this

24

threatening comment was issued as a coercive tactic designed to impair Mr. Con-ui's capacity for self-determination or otherwise elicit inculpatory statements.

Additionally, there is insufficient evidence demonstrating an "essential link" between Lt. Sudul's remark and the incriminating statements made by Mr. Con-ui in the sally port while being escorted by Lt. Sudul. This statement is the only one Mr. Con-ui seeks to suppress that was made in the immediate presence of Lt. Sudul, and it was made after Lt. Sudul provided Mr. Con-ui with reassurances that his safety would be honored. Upon receiving these reassurances, Mr. Con-ui turned over his weapon and submitted to the application of restraints voluntarily. At that time, only Lt. Sudul, Officer Turner, and Officer Celuck were near Mr. Con-ui's cell. (*See* T.R. 38). None of these officers had weapons on them. Mr. Con-ui's statements were not made in response to any questioning. And there is no evidence that Lt. Sudul, or any other officer, was threatening Mr. Con-ui at the time he made the statements in the sally port. Consequently, I do not find a sufficient link between Lt. Sudul's threatening comment[9] and the incriminating statements Mr. Con-ui made in the sally port.[10]

Furthermore, I do not find that Mr. Con-ui's background characteristics rendered him particularly susceptible to such a threat. For example, in *Fulminante*, the record contained evidence that the inmate had felt threatened by the prison population prior to the informant's coercive statements, had requested to be placed in protective custody while incarcerated,

---

[9] To the extent Mr. Con-ui argues that Officer Boynton's separate comment, "I would like to [kill you,] but the cameras are watching," was coercive and caused him to make incriminating statements involuntarily, I likewise find the absence of an essential link between this comment and any of Mr. Con-ui's statements. Officer Boynton was not present or nearby when Mr. Con-ui made the statements in the sally port, and Lt. Sudul had already given reassurances to Mr. Con-ui concerning his safety. (T.R. 39-40, 95). Additionally, Mr. Con-ui made his statements regarding "disrespect" to Officer Boynton before Officer Boynton made the comment in question. (T.R. 93-94). Accordingly, I do not find a sufficient link between Officer Boynton's comment and any of Mr. Con-ui's incriminating statements.

[10] Although there is arguably some link between Lt. Sudul's comment and the statements Mr. Con-ui made to other officers prior to submitting to restraints at the request of Lt. Sudul, I do not find that they were involuntary, based on the other reasons detailed in this opinion.

and had previously been admitted to a psychiatric hospital. 499 U.S. at 286 n.2. As such, the Supreme Court accepted the lower court's conclusion that the informant's indirect threat to withhold protection from other prisoners unless the inmate confessed to a crime rendered the confession involuntary because the inmate was "particularly susceptible" to that type of threat. *See id.* at 286 & n.2. Likewise, in *Lam*, the record evidenced that the defendant was "actually afraid of the agents' threats of violence." 304 F.3d at 266. The Third Circuit noted that the defendant's personal characteristics–a mother of three who grew up in another country and had no criminal record–made her particularly vulnerable to the threats of gang violence. *See id.* at 265-66.

By contrast, although Mr. Con-ui initially refused to turnover his weapon after hearing Lt. Sudul's threat, there is no evidence that Mr. Con-ui possesses vulnerabilities that would render him susceptible to making incriminating statements involuntarily in response to Lt. Sudul's threatening remark. Mr. Con-ui has an extensive criminal record, having been arrested six times as an adult. (T.R. 131-32; *see* Gov't Ex. 6); *cf. Lam*, 304 F.3d at 265. He presumably is accustomed to interactions with prison guards and other inmates, which, as Lt. Sudul explained, sometimes includes threatening language. (T.R. 34). Mr. Con-ui is an adult who has resided in this country for almost all of his life. There is no evidence that Mr. Con-ui had an antagonistic relationship with any corrections officers prior to this incident; in fact, there is evidence that Mr. Con-ui had established a positive relationship with the officers at USP Canaan. (*See* Doc. 998-2, at 2). Thus, unlike the defendants in *Fulminante* and *Lam*, there is no evidence that Mr. Con-ui possesses personal vulnerabilities that make him susceptible to exploitation by a statement such as the one made by Lt. Sudul. Additionally, Officers Boynton, Celuck, and Turner all testified that Mr. Con-ui appeared calm and emotionless during the episode. Accordingly, there is evidence suggesting that Mr. Con-ui was not so nervous or afraid at this time so as to indicate that his statements were the product of coercion. *Cf. Lam*, 304 F.3d at 266; *Rose*, 189 F. Supp. 3d at 542.

Relatedly, Mr. Con-ui's prior dealings with the criminal justice system counsel in favor of finding his statements to have been voluntary. FBI Special Agent Shawn McMillen

testified that on the night the attack on Officer Williams occurred, he attempted to interview Mr. Con-ui after he had been placed in the holding cell. (T.R. 130). After Agent McMillen made several prefatory statements, Mr. Con-ui told Agent McMillen: "[R]ead me my rights so I can invoke my rights." (T.R. 131). Agent McMillen further testified that Mr. Con-ui made the same statement in response to questioning from the other FBI Agent on site. (T.R. 131). Clearly, not only does Mr. Con-ui have a lengthy criminal history, but evidently he had experience with questioning from law enforcement officials and some understanding of his constitutional rights. These factors suggest that his statements were not the product of coercive police activity.

Accordingly, considering the totality of the circumstances, I will not grant Mr. Con-ui's Motion to Suppress on the ground that his statements were involuntary.

### III. Findings of Fact

I find the following facts, based upon the court records and the evidence submitted on this motion. Most of the chronological facts are undisputed. Any conflicts are resolved based upon the evaluation of credibility and the record. To the extent that the above portion of the memorandum contains findings of fact in addition to those expressed below, they shall be deemed to be part of the findings of fact.

1. Shortly after 10:00 p.m. on February 25, 2013 at USP Canaan, correctional officer Bennett discovered Officer Eric Williams on the floor of prison Unit C-1 (the "Unit"), unconscious and bleeding from wounds on his face, head, and neck. (T.R. 11-13; 31, 67, 107, Doc. 1152).

2. No inmates were in sight; it appeared that all inmates had retreated to their cells, which encircled the unit. (T.R. 13).

3. The doors to their cells, however, were unlocked. (T.R. 32-33, 89-90, 107, 123).

4. Officer Bennett immediately summoned other officers who quickly descended on the unit. (T.R. 13).

5. Around 10:15 p.m., Lt. Sudul received a radio transmission from Officer Bennett requesting assistance and noting that "weapons [were] involved." (T.R. 31).

6.	Lt. Sudul responded to the call and arrived at Unit Charlie 1 soon thereafter. (T.R. 31-32).

7.	Upon arriving at the Unit, Lt. Sudul recognized Officer Williams on the floor and saw that he was injured. (T.R. 32).

8.	The Unit contained sixty-four cells. (T.R. 32, 35).

9.	Lt. Sudul then shouted "I am going to kill one of you motherfuckers." (T.R. 34; Doc. 998-2, at 1).

10.	All one hundred seventeen (117) inmates housed in the Unit at the time remained in their cells. (T.R. 13, 132).

11.	Lt. Sudul was unaware of the assailant's identity at the time of this comment and did not know the circumstances surrounding Officer Williams's injuries. (T.R. 34).

12.	After medical aid began to be administered to Officer Williams in the Unit, Lt. Sudul realized that all of the cell doors were unlocked. (T.R. 32-33).

13.	Lt. Sudul, along with other members of the corrections staff, began the process of manually locking each of the sixty-four cells in the Unit. (T.R. 33-35).

14.	Lt. Sudul led the team in this process and was in possession of a pepper ball launcher at this time, which is a device that fires a small hardened projectile designed to cause a chemical reaction that affects the mucus membranes in a person's nose and mouth. (T.R. 33-36).

15.	After all of the cells were locked, the team proceeded to conduct an upper body search of each inmate in the Unit, cell-by-cell, as is standard procedure. (T.R. 36, 69).

16.	After the Unit was secured, Lt. Sudul went to the medical unit to check on Officer Williams, leaving Officer Swartzfager, Officer Boynton, and Officer Baux in charge of the upper body checks. (T.R. 37-38, 46).

17.	Officer Swartzfager reached Mr. Con-ui's cell and recognized blood on Mr. Con-ui's hands. (T.R. 70-71).

18.	Mr. Con-ui was unresponsive to Officer Swartzfager's questions and appeared

"[m]otionless" with a "cold dead stare." (T.R. 71).

19. Officer Swartzfager radioed Lt. Sudul that "we found him," and proceeded to conduct upper body checks of other inmates. (T.R. 71-72).

20. Shortly afterwards, following the discovery of blood on the stairs leading to Mr. Con-ui's cell, number 221, Officer Boynton proceeded to the second floor of the Unit and noticed a cut on Mr. Con-ui's hand. (T.R. 70, 92-93, 110, 124).

21. Officer Boynton turned around and told Officer Swartzfager to contact Lt. Sudul. (T.R. 94).

22. Officer Boynton said, "Did you do this?" Mr. Con-ui nodded his head in the affirmative. (T.R. 93).

23. Officer Boynton then said, "You did this? You killed him? Over what?" Mr. Con-ui responded, "Yes, disrespect issue." (T.R. 93-94).

24. Officer Boynton noticed that Mr. Con-ui was holding a clear plastic knife. (T.R. 94).

25. Officer Boynton ordered Mr. Con-ui to slide the knife under the door, but Mr. Con-ui said, "No, I'll keep it." (T.R. 94).

26. Officer Boynton told Mr. Con-ui to slide the weapon under the door, to which Mr. Con-ui responded "no" because "you guys are going to kill me." (T.R. 94).

27. Officer Boynton responded, "I would like to [kill you,] but the cameras are watching." (T.R. 94).

28. Mr. Con-ui then placed the weapon in the sink in the cell. (T.R. 95).

29. Mr. Con-ui appeared "[r]elaxed, very calm" during this exchange. (T.R. 95).

30. No officer present during the exchange was armed; even if Mr. Con-ui was not aware of that, no weapons were drawn or displayed. (T.R. 51).

31. The officers did not trick or bait Mr. Con-ui, and aggressive questioning tactics were not employed.

32. Mr. Con-ui was not bound or physically restrained by the officers.

33. Mr. Con-ui appeared to have a "calm" demeanor around this time and displayed "[n]o emotion." (T.R. 113, 126).

34. Mr. Con-ui was not free to leave his cell because he was an inmate and being confined to a locked cell was the normal and expected restraint on freedom he, along with hundreds of other inmates, experienced on a daily basis prior to the incident as a natural consequence of the incarceration. (T.R. 11).

35. Lt. Sudul was notified via radio that the officers had an inmate armed in his cell. (T.R. 38, 72).

36. Lt. Sudul ordered Officer Celuck and Officer Turner to stay back and told the rest of the team to head to the green corridor in order to prepare for a cell extraction. (T.R. 38, 95, 112, 120).

37. As Officer Celuck was standing in front of Mr. Con-ui's cell door, he heard Mr. Con-ui say, "He disrespected me, CO, he disrespected me, CO." (T.R. 111, 126).

38. The statement was made by Mr. Con-ui without any prompting by Officer Celuck, or any other officer, and was not made in response to any questioning. (T.R. 125-26).

39. Lt. Sudul returned to the Unit and went to Mr. Con-Ui's cell. (T.R. 39).

40. Lt. Sudul no longer had the pepper ball launcher on him when he reached Mr. Con-Ui's cell. (T.R. 51, 70).

41. Neither Officer Celuck nor Officer Turner had any weapons on them at this time. (T.R. 51).

42. Lt. Sudul told Mr. Con-ui that he needed to submit to the application of restraints. (T.R. 39).

43. Lt. Sudul noticed a plexiglass sharpened weapon in the sink in the cell. (T.R. 40).

44. Mr. Con-ui refused to submit to restraints initially, commenting that he had "heard what [Lt. Sudul] said when [he] first came in [to the Unit] and I don't know if I want to do that." (T.R. 39; Doc. 998-2, at 3).

45. Lt. Sudul reassured Mr. Con-ui that no harm was going to come to him. (T.R. 39-40).

46. Mr. Con-ui agreed to turn over the weapon to Lt. Sudul, first attempting to slide it under the door unsuccessfully and ultimately dropping it through the food slot. (T.R. 40).

47. After receiving reassurances from Lt. Sudul, Mr. Con-Ui placed his hands through the food slot voluntarily, was placed into handcuffs, and removed from the cell. (T.R. 40).

48. Lt. Sudul, along with Officer Turner, proceeded to walk Mr. Con-ui down the stairs, around the crime scene, and up through the sally port to the secure corridor. (T.R. 41).

49. Lt. Sudul placed his hands on Mr. Con-ui's handcuffs and left elbow during this escort. (T.R. 54).

50. No questions were posed to Mr. Con-ui at any point during the transfer. (T.R. 41).

51. An extraction team was never called to Mr. Con-ui's cell. (T.R. 96).

52. When they reached the sally port area, Mr. Con-ui stated: "Hey man, I am sorry but I had to do what I had to do. I am sick of all your people's disrespect." (T.R. 41; Doc. 998-2, at 3).

53. The statement at issue was made by Mr. Con-ui without any prompting or questioning. (T.R. 41, 115).

54. The officers were ordered "not to speak to [Mr.] Con-ui" (T.R. 73), and he was not engaged by any officers.

55. Lt. Sudul responded to Mr. Con-ui: "*Miranda* doesn't apply to me. I suggest you remain silent." (T.R. 42; Doc. 998-2, at 3).

56. Upon reaching the red corridor, Mr. Con-ui was placed in the lieutenant's office holding cage, and his hand restraints were removed. (T.R. 42).

57. Lt. Sudul locked the door to the lieutenant's office. (T.R. 59-60).

58. A camera was set up in front of Mr. Con-ui's holding cage (T.R. 26, 27, 57, 58, 62; Doc. 998-1, at 3); there is no video evidence that Officer Bennett entered the lieutenant's office and asked Mr. Con-ui a question.

59. Lt. Sudul learned that Officer Bennett said that he had an interaction with Mr. Con-ui while Mr. Con-Ui was in the holding cell in the lieutenant's office for the first time at the suppression hearing. (T.R. 58).

60. Officer Bennett admitted that he "never discussed" the interaction he had with Mr. Con-ui until his interview with the Federal Bureau of Investigation some three years after the murder of Officer Williams. (T.R. 22-23; Doc. 998-1).

61. Officer Bennett's staff memorandum, completed on February 25, 2013, omits any mention of the alleged exchange with Mr. Con-ui in Lt. Sudul's office. (T.R. 16; Gov't Ex. 5).

62. Mr. Con-Ui has been arrested six times as an adult. (T.R. 131-32; see Gov't Ex. 6).

63. On the night the attack on Officer Williams occurred, FBI Special Agent Shawn McMillen attempted to interview Mr. Con-ui after he had been placed in the holding cell. (T.R. 130).

64. After Agent McMillen made several prefatory statements, Mr. Con-ui told Agent McMillen: "[R]ead me my rights so I can invoke my rights." (T.R. 131).

65. Mr. Con-ui made the same statement in response to questioning from the other FBI Agent on site. (T.R. 131).

66. Dr. John Mitchell was the chief psychologist at USP Allenwood at the time he interviewed Mr. Con-ui. (T.R. 135).

67. Mr. Con-ui was transferred from USP Canaan to USP Allenwood after the incident involving Officer Williams occurred on the night of February 25, 2013. (See T.R. 136, 140).

68. Mr. Con-ui was placed in an observation cell in "health services" and subjected to ambulatory restraints. (T.R. 136, 148-49).

69. The interview with Dr. Mitchell occurred the next day while Mr. Con-ui was in the same observation cell. (T.R. 138, 152).

70. Mr. Con-ui was not provided with any advance notice prior to Dr. Mitchell's arrival for the evaluation. (T.R. 148).

71. Dr. Mitchell was accompanied by two officers during the evaluation: Captain Gabrielson and Lieutenant Stover. (T.R. 148).

72. Throughout the interview, Mr. Con-ui continued to be restricted by ambulatory

restraints. (T.R. 149).

73. Mr. Con-ui initially declined to answer questions about the attack on Officer Williams, but subsequently made statements concerning the incident in response to follow-up questions posed by Dr. Mitchell that concerned the details of the event involving Officer Williams. (T.R. 153-55; Gov't Ex. 6).

74. During the evaluation, Mr. Con-ui stated, inter alia, that "disrespect" was the primary reason that led to the incident at USP Canaan. (T.R. 145; Doc. 998-5; Gov't Ex. 6).

75. Mr. Con-ui further stated that he had "swallowed a lot" with regards to the disrespect from Officer Williams and felt like he could not tolerate such disrespect from him any longer. (T.R. 145; Doc. 998-5; Gov't Ex. 6).

76. Mr. Con-ui also stated that he had "overreacted." (T.R. 145; Doc. 998-5; Gov't Ex. 6).

77. Captain Gabrielson asked Mr. Con-ui questions about the attack on Officer Williams during the course of the interview. (T.R. 153, 155).

78. Captain Gabrielson is not a psychologist. (T.R. 153).

79. Dr. Mitchell informed Mr. Con-ui that information from the evaluation could later be subpoenaed for use at trial. (T.R. 140, 150-51).

80. Dr. Mitchell provided the government with information stemming from the evaluation without having been issued a subpoena. (T.R. 151-52).

81. Prior to conducting this evaluation, Dr. Mitchell was informed of the assault that Mr. Con-ui allegedly perpetrated upon Officer Williams. (T.R. 140, 149, 156).

82. Mr. Con-ui was not provided with a *Miranda* warning before the evaluation. (T.R. 150).

83. The encounter between Mr. Con-ui and Dr. Williams and the two officers lasted approximately twenty-five to thirty minutes (T.R. 147).

## IV. Conclusions of Law

1. Mr. Con-ui was not in "custody" for the purposes of *Miranda* during Mr. Con-ui's exchange with Officer Ryan Boynton.

33

2. Mr. Con-ui was not in "custody" for the purposes of *Miranda* when he made a statement to Officer William Celuck.

3. Mr. Con-ui was in "custody" for the purposes of *Miranda*, but was not subjected to an "interrogation" when he made a statement to Lieutenant Brian Sudul while being escorted by him to a holding cell.

4. Mr. Con-ui's nonverbal response to Officer Jeremy Bennett's question in the lieutenant's office is inadmissible. The preponderance of the evidence does not establish that Mr. Con-ui's nonverbal statement at issue was made.

5. Mr. Con-ui was in "custody" for the purposes of *Miranda* and was subjected to an "interrogation" when he was asked questions by Dr. John Mitchell and Captain Gabrielson during the interview at USP Allenwood.

6. None of Mr. Con-ui's statements were involuntary.

### V. Conclusion

For the foregoing reasons, I will deny in part and grant in part Mr. Con-ui's Motion to Suppress Statements (Doc. 998), in that (1) Mr. Con-ui's Statements during an Exchange with Officer Ryan Boynton will not be suppressed; (2) Mr. Con-ui's Statement to Officer William Celuck will not be suppressed; (3) Mr. Con-ui's Statement While Being Escorted by Lieutenant Brian Sudul will not be suppressed; (4) Mr. Con-ui's Response to Officer Jeremy Bennett's Question will be precluded; and (5) Mr. Con-ui's Statements to Psychologist John Mitchell will be suppressed.

An appropriate order follows.


June 2, 2017                                /s/ A. Richard Caputo
Date                                               A. Richard Caputo
                                                      United States District Judge